Whitaker, Judge,
delivered the opinion of the court:
The plaintiff, F. H. McGraw and Company, alleged eight causes of action in its petition, but in its proposed findings before the Commissioner and its argument before the court it urges only two grounds for recovery: one is to recover damages for itself and its subcontractors for an alleged breach of contract arising out of a stop order issued by the Veterans Administration; the other is to recover increased wages for itself and its subcontractors which were paid under authorization of the Wage Adjustment Board.
The plaintiff entered into a standard form of contract with the United States through the Veterans Administration on February 8, 1945, for the construction of certain additions to the Veterans Hospital in Dearborn, Michigan. The original contract price was $3,000,947.00. The work was to be completed within 400 days after notice to proceed. Notice to proceed was given on February 21, 1945, thus fixing the date for the completion of the work as March 28, 1946. The Veterans Administration (hereinafter referred to as the VA) accepted the work as substantially complete on January 30,1948. The work performed by the plaintiff and its subcontractors actually consumed 1073 days instead of the 400 days as contemplated under the original contract. The contracting officer found that the plaintiff was not responsible for any of this delay. He granted extensions of time to cover this extra period and assessed no liquidated damages against the plaintiff.
Under the contract plaintiff agreed to construct two buildings known as units “B” and “C,” which were ten-story *504 wings of the main hospital building; a separate three-story building known as Building No. 19; two connecting corridors; and some alterations to the boiler house building. As originally designed, the first six floors of unit “B” were to consist of office space, and the remaining four floors of general hospital space; unit “C” was to consist entirely of general hospital space and facilities; and building No. 19 was designed as the kitchen building.
1. Although plaintiff had great difficulty manning the job from its inception due to the general shortage of construction workers, which was aggravated by the removal of wage controls on non-federal work when the war ended about six months after the work started, it had fully manned it by the spring of 1946 and work was then in full progress. Then, on August 23,1946, the VA issued a stop order suspending forty to fifty per cent of the work on unit “B” and 20 to 30 per cent of the work on unit “C,” until certain contemplated changes could be decided on. On August 27, 1946, it issued a supplemental stop order suspending all work on building No. 19. The stop order and supplement thereto (hereinafter referred to as the stop order) are set forth in finding 24.
This stop order, which emanated from the VA central office, was issued without consultation with the VA’s representatives on the project or with the plaintiff to determine its wisdom or advisability. Upon receipt of the stop order the plaintiff immediately notified the VA that compliance with it would result in the loss of a substantial part of the labor force which had been so difficult and so expensive to obtain and that it would be time-consuming and expensive to reman the job and would adversely affect the job progress and costs; nevertheless, plaintiff on August 30, 1946, ceased operations in the areas believed to be affected by the stop order. Plaintiff’s work on the project was 66.5% complete at that time.
The areas in units “B” and “C” which were affected by the stop order were not at all clear. The stop order suspended all work on the first, third and tenth floors of unit “B” and all work south of designated columns on all floors of unit “B”; all work on the third floor of unit “C”, and all *505 work north of designated columns on the second, fourth, fifth, sixth, seventh, eighth, ninth and tenth floors of unit “C”; but in order to determine where work could safely proceed in other areas, it was necessary to know what the changes were and to have the mechanical drawings, so that the mechanical trades could determine how the stopping of all work on certain floors and in certain areas would affect their work on other floors and in other areas.
The preliminary prints of the revised drawings indicating proposed changes were sent to the plaintiff on September 6, 1946, with instructions to proceed with the work in unaffected areas. However, the preliminary prints showed that the proposed changes, which were extensive and complicated, would materially affect and curtail the work of the mechanical trades, and thus the finishing trades, in the so-called “unrestricted” areas. For example: In unit “B” where the work was stopped completely on the first, third and tenth floors and in areas south of designated columns on all the floors, the prints indicated that a morgue and embalming rooms and general office space and handicraft workshops were to be installed on the first floor; a patients’ dining room, serving kitchens, dishwashing rooms, offices, and three wards, on the third floor; an operating suite, on the tenth floor; and various other changes, on the remaining floors. The mechanical installation necessary to service the proposed accommodations, such as plumbing, heating, and wiring, originated in the basement of the building and obviously each floor through which they were required to go was affected by the changes.
It was not until October 1,1946, that plaintiff received the drawings and specifications covering the proposed changes. Plaintiff was requested to submit a detailed proposal covering the cost of the proposed changes. On October 8, 1946, the VA’s senior project manager visited the project, and after discussing plaintiff’s rough estimate of the costs of the proposed changes, advised plaintiff that the estimate was greater than the funds available and that it would be necessary to revise the proposed changes. On November 13,1946, plaintiff received new drawings and revised specifications. These new drawings and specifications, which were modified on Novem *506 ber 14, 1946, became the final changes. Plaintiff submitted its proposal on or about January 7,1947, and the VA gave the plaintiff notice to proceed on the changes on January 29,1947, thereby lifting the 159-day partial stop order.
On December 2,1947, Change Order “XX” was issued increasing the contract price by $403,245.41, which represented the contracting officer’s equitable adjustment for the changes made by the new drawings and specifications. This did not include any amount for damages for delay because the contracting officer and head of the department stated that they had no authority to award damages.
The plaintiff contends that the changes were beyond the scope of the contract and that the VA’s stoppage of the work, together with its failure to promptly decide on the changes to be made, was a breach of its contract. The defendant contends that since the VA reserved the right under Article 3 of the contract to make changes in the drawings and specifications within the general scope thereof at any time, and also reserved the right under section 3(h) of the specifications to suspend any portion of the contract work, the partial stop order and delay incident thereto was not a breach of the contract.
The changes made under change order “XX” were within the general scope of the contract. Although the changes were extensive, they were not so extensive as to be a cardinal change. See General Contracting & Construction Co., Inc., v. United States, 84 C. Cls. 570. That the defendant had the right to make changes is clear. Article 3 of the contract.
The plaintiff contends that the stop order was unjustified and as such was a breach of its contract, citing and relying on Brand Investment Co., v. United States, 102 C. Cls. 40. It is true that an unjustified stop order is a breach of the contract. However, it would appear that in view of the extensive proposed changes, the issuance of the stop order was justified in this case. Without the stop order, unnecessary expense would have been incurred in doing work and then tearing it out and doing it again.
But plaintiff’s contention that the VA unreasonably delayed in deciding on the changes to be made is well founded. It is settled that the defendant is allowed under the contract *507 only a reasonable time within which to make permitted changes in the specifications and that the defendant is liable for breach of its contract if it unreasonably delays or disrupts the contractor’s work. J. A. Ross & Co. v. United States, 126 C. Cls. 323, 332; Continental Illinois National Bank, et al., v. United States, 121 C. Cls. 203, 243, cert. den. 343 U. S. 963; James Stewart & Co., v. United States, 105 C. Cls. 284, 328; Nils P. Severin v. United States, 102 C. Cls. 74, 85; Silberblatt & Lasker, Inc., v. United States, 101 C. Cls. 54, 82, and the cases there cited.
In the instant case, the VA, fully aware of the construction manpower shortage in the Dearborn area, the difficulty and expense that the plaintiff had been put to in order to successfully man the job, the constantly increasing cost of labor, material and equipment, and that the project was 66.5% complete, decided, without consulting its representatives on the job or the plaintiff, to issue a partial stop order, which was ambiguous, with no one on the project empowered to interpret it so that the plaintiff could safely proceed in the unaffected areas, and held up the work 159 days before authorizing plaintiff to proceed.
Two weeks after the issuance of the stop order, the VA sent plaintiff preliminary prints, but these were of little value without the mechanical drawings. Five weeks later the plaintiff received the revised drawings and specifications with instructions to submit a detailed cost proposal for the indicated changes. While the plaintiff was in the process of working up a definite proposal, the VA decided that the changes would cost too much as indicated by the rough estimate, and again it revised the specifications. Over two and a half months later the plaintiff received another set of revised drawings and specifications and a request to submit a cost proposal on the changes. The plaintiff took one and a half months to submit its cost proposal, which also included claims for part of the plaintiff’s and its subcontractor’s damages. After its submission it took the VA twenty days to decide to give the plaintiff notice to proceed with the changes.. One hundred fifty-nine days elapsed from the issuance of the stop order to the time plaintiff was permitted to resume work.
*508 We believe that it was not in contemplation of the parties in this case that there should be so long a delay in deciding on the changes to be made. For all delay of over a month we think defendant is liable in damages.
The delay not only resulted in complete suspension of the work in the affected areas, but also prevented the doing of much work in the so-called unaffected areas, because many of the changes to be made were on the upper floors, which necessarily affected much of the work on the lower floors, such as plumbing, heating, and electrical work; and the inability to do such work affected the construction of partitions and practically all of the inside work.
During the stop order period plaintiff’s labor force was substantially reduced because of lack of work that could be done. In August there were employed on the job 266 men; in September, 243; 190 in October; 126 in November; and 139 in December. Labor was hard to get; it had been very difficult to man the job in the beginning, and more difficult after the lifting of the stop order, because of the regulations of the Wage Adjustment Board, discussed later.
There can be no doubt that plaintiff was severely damaged, which could have been avoided by more foresight on defendant’s part and more diligence in deciding on the changes to be made.
2. Plaintiff next contends that it is entitled to recover the full amount of the wage increases which it paid for the work under the original specifications. It was paid for the increased wages paid for doing the work called for by the change orders. The plaintiff’s argument is that the VA, who was a party by ratification to the Wage Stabilization Agreement of May 22, 1942, which stabilized wages at a certain level, breached that agreement by allowing wage increases. The Wage Stabilization Agreement was an agreement between various government agencies and the Building and Construction Trades Department of the American Federation of Labor wherein it was agreed that wages would not be increased on national defense work except under certain conditions.
It is obvious that this agreement was not entered into for plaintiff’s benefit and was no part of its contract. More *509 over, the agreement, as amended before the letting of the plaintiff’s contract, under one of its exceptions, allowed wage increases where the July 1, 1942 rates were inadequate because: “* * * (b) they were applicable in a locality where changing conditions in the building construction industry require a revision of wage rates; * *
In order to properly man the job the plaintiff applied for and received approval for wage increases. Neither the VA nor the Wage Adjustment Board directed any increase in wages; it merely permitted an increase; and it was reiterated again and again that the cost to the Government would not be increased on account thereof.
The rulings and regulations pertaining to reimbursement for increased wages, relied on by the plaintiff, relate to contracts containing a clause specifically allowing such reimbursement. The plaintiff’s contract contains no clause allowing reimbursement and, therefore, there is no obligation on the part of the defendant to make reimbursement. Irwin & Leighton v. United States, 115 C. Cls. 18; Francis Kirchhof et al., v. United States, 121 C. Cls. 476.
3. The plaintiff is also suing to recover damages for the benefit of seven of its subcontractors and one supplier. Six of the subcontractor’s contracts contained exculpatory clauses and a release of all liability on final payment, which completely exonerated plaintiff from any liability whatsoever to the subcontractors. The other subcontractor’s contract, while not containing the exculpatory clause, did contain the release of all liability on final payment, which completely exonerated the plaintiff from any liability whatsoever to the subcontractor. All of the subcontractors have accepted final payment without specific reservation of any rights against plaintiff. We have held that the prime contractor cannot recover for the benefit of its subcontractor when the prime contractor is not liable to the subcontractor for the damages caused by the defendant’s breach. Continental Illinois National Bank, et al., v. United States, 126 C. Cls. 631; Continental Illinois National Bank, et al., v. United States, 121 C. Cls. 203, cert. den. 343 U. S. 963, and the cases there cited.
*510 The plaintiff contends, however, that the above exoneration clauses have been waived by the VA and that it agreed to reimburse plaintiff for the subcontractors’ damages. Defendant never admitted liability to anyone for damages. The VA has paid what it thought was an equitable adjustment for the changes made. It has never admitted liability for anything more, nor has it ever admitted liability to the subcontractors.
Although plaintiff repeatedly advised the YA that it was going to hold the YA liable for damages caused to itself and its subcontractors, and presented the subcontractors’ claims to the contracting officer and the head of the department, and is presenting their claims in this court, there is absolutely no evidence indicating that the plaintiff by so doing, or otherwise, waived the benefit of the exoneration clauses.
Plaintiff is not entitled to recover for the benefit of its subcontractors.
The plaintiff’s claim in behalf of Pontiac Millwork Company, a supplier, has no relationship to the defendant’s breaches of contract. Since this expense, if it is such, was not caused by the YA’s breach of contract, no recovery is allowable on that claim.
4. We come now to the damages caused by the YA’s breaches of contract. The plaintiff must prove its damages with reasonable certainty, but they do not have to be proved with absolute certainty. It is sufficient if plaintiff furnishes a reasonable basis for its computation, even though the result is only approximate. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U. S. 359; Story Parchment Co., v. Paterson Co., 282 U. S. 555; Palmer v. Connecticut Ry Co., 311 U. S. 544; Needles v. United States, 101 C. Cls. 535; First-Citizens Bank & Trust Co., et al., v. United States, 110 C. Cls. 280; Reiss & Weinsier, Inc., v. United States, 126 C. Cls. 713, and the cases cited therein.
The plaintiff claims the difference between the original contract price for all the work, as increased by change orders, and its direct cost of completing the job. Plaintiff’s costs were $3,987,712.50, and the contract price as increased by change orders was $3,575,123.40, a difference of $412,589.10. It also claims $40,846.61 as certain home office and field over *511 head. This is a total of $453,435.71. Plaintiff states that if the court finds against it on the wage claim, which we have, that $66,659.37 should be deducted from the $453,435.71. The plaintiff relies on Great Lakes Dredge & Dock Co., v. United States, 119 C. Cls. 504, cert. den. 342 U. S. 953, and MacDougald Construction Co., v. United States, 122 C. Cls. 210.
This method of proving damage is by no means satisfactory, because, among other things, it assumes plaintiff’s costs were reasonable and that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff’s bid was accurately computed, which is not always the case, by any means.
Our opinion in Great Lakes Dredge & Dock Co., v. United States, supra, was not intended to give approval to this method of proving damage, except in an extreme case and under proper safeguards. In that case plaintiff had encountered unforeseen conditions and our problem was to determine the resulting equitable adjustment to which it was entitled, since the contracting officer had not made an equitable adjustment in the manner required by the contract. Article 4 of the contract provided that if unforeseen conditions were encountered, “any increase or decrease in cost” should be adjusted. In that case we held that the adjustment should be based on the increase in cost under the actual conditions, and not on what might have been the increase if some other method had been employed to cope with the unforeseen condition. Approval was not given to proof of damages for breach of contract by showing the difference in plaintiff’s bid and his costs on the entire j ob.
It is true we were forced in that case by the lack of other proof to compute the increased cost resulting from the unforeseen conditions encountered by taking plaintiff’s actual costs incurred on account thereof and deducting therefrom certain costs for which plaintiff was responsible and then deducting from the balance the average of' all bids and the defendant’s estimate of the cost of the work. But by so doing we did not intend to give approval to proof, of damages'by showing difference of cost and bid on the entire job. In the MacDougald case substantially the same thing was done. In *512 the Great Lalces case there had been no finding by the contracting officer, which had been made as the contract required, on the amount of the equitable adjustment.
Here the contracting officer has made a finding on the amount to which plaintiff is entitled as an equitable adjustment and this was done in the way the contract required. In such case, it is binding on us, unless it is not supported by substantial evidence. United States v. Callahan Walker Construction Co., 317 U. S. 56. It is not seriously contended that it was not.
There was not included in the amount found by the contracting officer any item covering damages for delay, but there is proof of these damages more reliable than the difference in plaintiff’s estimate and its actual costs.
The evidence shows that the 159-day partial stop order caused 48 days’ delay on the work under the original specifications. The plaintiff has satisfactorily proved its field office overhead and expense and the allocable portion of its home office overhead for this 48 days. This amounts to $15,309.12.
The plaintiff also claims, and the record shows, that it incurred expenses in an amount approximating $28,531.15 because the stop order prevented it from effectively and efficiently planning and coordinating its work on the project.
The plaintiff also claims, and has satisfactorily proved, that its field office overhead and expense and the allocable portion of its home office overhead between January 30,1948, the date the job was accepted as substantially complete, and May 24, 1948, were $13,281.62. These expenses were incurred while it was supervising the installation of equipment in building 19 that could have been installed before January 30, 1948, had the VA made up its mind within a reasonable time on the equipment that it wished to have installed.
Plaintiff is entitled to recover of the defendant a total of $57,121.89. Judgment for this amount will be entered.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
*513 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. The petition in the case sets out eight causes of action. These causes of action are not mutually exclusive, and it is impossible, under the proof, to put a money value on them separately.
Plaintiff in its suggested findings made no attempt to follow the details of causes of action set out in the petition, but has simply asked for the recovery of the difference between its cost and the amount paid it, with a possible omission of an amount it attributes to increased wages paid during the original contract period, with the addition of two extensions about which it makes no complaint.
2. F. H. McGraw and Company, hereinafter sometimes referred to as McGraw, is a corporation duly organized and existing under and by virtue of the laws of the State of New Jersey, with its principal place of business at Hartford, Connecticut.
3. On November 28, 1944, the Veterans’ Administration, hereinafter sometimes referred to as the defendant, or the VA, issued an invitation for bids for furnishing all labor and materials and performing all work required for constructing and finisliing complete additional buildings and utilities at the Veterans’ Administration Hospital, Dearborn, Michigan.
4. The invitation for bids carried the following notations:
IN CONNECTION WITH THIS PROJECT, THE WAR PRODUCTION BOARD HAS AUTHORIZED THE VETERANS ADMINISTRATION TO USE THE ALLOTMENT SYMBOL P-6 AND PREFERENCE RATING AA-S TO PURCHASE APPROVED MATERIALS, MACHINERY AND EQUIPMENT.
THE VETERANS ADMINISTRATION HAS BEEN DECLARED AN ESSENTIAL WAR AGENCY AND IS ENTITLED TO PRIORITIES IN LABOR SECOND ONLY TO THE WAR AND NAVY DEPARTMENTS.
5. Article 27 (as amended) of the general conditions of the invitation for bids placed upon bidders the responsibility of informing themselves as to the local labor con *514 ditions and prospective changes, including any existing or pending collective bargaining agreements which might provide for rates in excess of those predetermined by the Secretary of Labor, as listed and shown thereunder.
6. Prior to the submission of its bid, plaintiff sent a representative to the Detroit area to check on the conditions of employment and prevailing wage rates. The representative verified that the minimum wage rates set forth in the specifications were the prevailing wage rates in the Detroit area, and that, as far as he could determine, there were no existing or pending collective bargaining agreements in effect.
7. On January 4, 1945, plaintiff submitted its bid in the amount of $2,750,000 for Item 1 (General Construction), subject to a deduction of $19,000 under Alternative (a), and subject to an addition of $2,500 under Alternative (b) of Item 1. By telegram dated January 9,1945, plaintiff increased its bid for Item 1 to $2,998,447, eliminated the deduction under Alternative (a) and left its original bid under Alternative (b) of Item 1 unchanged.
On January 9, 1945, defendant opened the eleven bids which had been received under its invitation for bids.
By letter dated February 3,1945, defendant advised plaintiff that it was taking longer than originally contemplated in arriving at a decision concerning awarding of the contract, and requested plaintiff to advise the defendant concerning its willingness to extend the period of acceptance for an additional 15 days. Plaintiff agreed to so extend its bid by letter dated February 8, 1945.
8. Defendant accepted plaintiff’s bid of January 4, 1945, as modified by its telegram of January 9, 1945, and thereafter a contract was duly executed by and between the parties. This contract, identified as Contract No. VAc-1365, dated February 8,1945, was for the sum of $3,000,947, and it provided that the work required was to be completed within 400 calendar days after receipt of notice to proceed. The work required is described in the contract document as follows:
article 1. Statement of work. — The contractor shall furnish the materials, and perform the work for constructing and finishing complete for Veterans Administration at dearborn, Michigan, Additions to Main Build *515 ing No. 1 (Unit “B” and Unit “C”), one Kitchen and Dining Hall Building No. 19, one Connecting Corridor “A-B”, one Connecting Corridor “A-C”, and Alterations to Boiler House Building No. 10, providing steel windows as specified under Article 13 of Section 18CA (“Metal Windows”) in lieu of wood windows; including Roads, Walks, Grading and Drainage, Plumbing, Heating, ventilation, Electrical Work, Boiler and Boiler Plant Equipment, Coal Handling Equipment, Kitchen Equipment, Sterlizing Equipment, Laboratory Equipment and Outside Services; but not including Electric Elevators and Refrigerating Equipment for the consideration Of THREE MILLION NINE HUNDRED E0RTY-SEVEN dollars ($3,000,947.00) in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows: Specifications for Additional Buildings and Utilities for Veterans Administration at Dearborn, Michigan, November 28,1944 and the schedules and drawings mentioned therein, Addenda No. 1 dated December 13, 1944 and No. 2 dated December 27, 1944 as contemplated by Item I and Alternate (b) under Item I of the Contractor’s proposal dated January 4,1945, as modified by telegram dated January 9, 1945, and letter of acceptance dated February 8, 1945.
9. The contract provided, in pertinent part, as follows:
article 2. Specifications and drawings. — The contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the contracting officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided.
article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope *516 thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered : Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
aRticlb 9. Delays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event it will be impossible to determine the actual damages for the delay and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay *517 until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes ox delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
ARtiolb 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
article 16. Payments to contractors. — (a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration.
*518 (b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: Provided, however, That the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full: And 'provided further, That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions.
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
(d) Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.
10. The general conditions of the specifications provided, in part, as follows:
3. Bights Reserved:
The Government reserves the following rights: * * * (h) To suspend any portion of the contract work whenever the Contracting Officer deems it necessary for the purposes or advantage of the work; * * *.
6. Government Superintendence:
A superintendent is to be detailed for the purpose of superintending the construction of this work, but such superintendency may not be continuous for the reason that he may also be employed upon other buildings, or he may be detailed for other purposes and his absence at any time is not to be considered as a reason for delay in carrying out the contract. The Veterans Administration shall have free access at all times to the work *519 and shops for the purpose of making inspection * * *. No claim for an extension of time or for additional compensation will be entertained by the Government except as provided for in the contract.
10. Samples and Material Lists:
(a) The contractor shall submit for approval samples of such materials to be used in the work as may be herein required. If schedule of samples required is furnished by the Veterans Administration, samples must be submitted in accordance therewith, and each sample shall be marked with the corresponding item number given on the schedule. No materials shall be used which do not equal the approved samples. Until such approval has been given, he must not incorporate in the work any materials or appliances to be so approved. The approval or acceptance of samples shall not preclude the rejection of any material upon the discovery of defects in same prior to the final acceptance of the completed work.
(b) In connection with the mechanical work of the project (plumbing, heating, electrical work, electrical elevators, refrigerating equipment, etc.), the contractor shall submit a complete list of materials and other required information, as listed under the respective mechanical sections of the specifications, within thirty days after date of notice to proceed; no consideration will be given to partial lists submitted from time to time. In the event these requirements are not complied with, the Contracting Officer reserves the right to select all materials and appliances, and such equipment must be installed without change in contract price.
* * ❖ * #
(f) All samples and other required information shall be submitted in sufficient time to permit proper consideration and action on same through the regular Government procedure, before any materials, which such samples or information represent, are delivered on the work. *****
(h) Except as otherwise noted, all samples shall b® sent to the Central Office of the Veterans Administration, Washington 25, D. C.
* * • * * *
(m) Approved samples of materials not subject to destructive tests will be sent direct from the Veterans Administration to the superintendent at the work and, except as otherwise mentioned, will-be kept on file by him until the completion of the contract, at which time *520 all such samples will be delivered to the contractor as his property. * * *
13. Shop Drawings:
(a) The contractor shall submit four copies of full size details when required and all shop or setting drawings and schedules required for the work of the various trades and the Veterans Administration will pass upon them with reasonable promptness. If schedule of shop drawings required is furnished by the Veterans Administration, shop drawings must be submitted in accordance therewith, and each drawing must be marked with the corresponding item number given on the schedule. Each drawing shall also have marked thereon, proper descriptive title, manufacturers number, name of project for which submitted, and name of building and exact location where the material covered by such drawing is to be used. A space (approximately 3" x 5") shall be provided at the lower right hand corner of each drawing to receive Veterans Administration stamp. Drawings should not be rolled for shipment but should be folded to 10" x 12" in size, with printed side out. The Veterans Administration’s approval of such drawings or schedules shall not relieve the contractor from responsibility for deviations from drawings or specifications, unless he has in writing called the contracting officer’s attention to such deviations at the time of submission, nor shall it relieve him from responsibility for errors of any sort in shop drawings or schedules.
(b) The contractor will be held responsible for any delay in the progress of the work which may be due to his failure to observe these requirements, and the time for the completion of his contract will not be extended on account of his failure to promptly submit shop drawings in strict accordance therewith.
(c) Except as otherwise noted, all shop drawings shall be sent to the Central Office of the Veterans Administration, Washington 25, D. C.
16. Inspection:
(a) No inspection of materials and finished articles will be made at the place of production, manufacture or shipment, unless otherwise noted in the specifications.
Samples must be submitted to the Veterans Administration for approval as hereinbefore noted, but the inspection of materials, etc., furnished after such approval will be made by the superintendent upon delivery at the site.
(b) Final inspection will not be made until all work under the contract is completed. The contractor shall *521 notify the Veterans Administration, through the superintendent, ten days prior to the date on which the work will be ready for final inspection. Should it develop that the work installed does not justify such inspection at that time, or that the character of the materials or workmanship is such that reinspection is found necessary, the cost of such reinspection including the salary of the inspector, his traveling and other expenses, shall be borne by the contractor and will be deducted from any money due him on his contract.
24. Liquidated Damages:
(a) The contractor will pay to the Government, by way of liquidated and ascertained damages and not as a penalty, the sum herein specified for each calendar day beyond the date or dates stated in his bid which he may require to complete the contract, to compensate the Government for its delayed possession. If any unit of the work contracted for is accepted in advance of the whole, the amount of liquidated damages then operative will be reduced in proportion to the total value of the work contracted for and of that remaining unaccepted. If a_ separate price has not been stated in the contractor’s bid for the work remaining unaccepted, determination of the value thereof will be made from the approved schedule of costs hereinbefore provided for under “Schedule of Payments.”
(b) The deductions required under this article for failure to complete the work included under each item of the bid, in the time stated, will be at the following rates, all as subject to the provisions of paragraph on “Delays— Damages” in Government Form of Contract:
ITEM 1 — General Construc-
tion -$300. 00 per calendar day.
‡ ‡ $
(c)Liquidated damages will not be assessed on account of delays caused by late deliveries of materials and equipment where such late deliveries are shown to be without fault or negligence of the contractor but due solely to the operation of the priority and allocation system which has been adopted in connection with the National Defense Program.
11. Following the award of the contract, but prior to the issuance of formal notice to proceed, the defendant wrote to plaintiff, under date of February 10, 1945, in part, as follows:
_ Due to the governing regulations of the War Production Board restricting the available supplies and the *522 use of certain construction materials through, the priority system, you should take sufficiently advanced action on all priority matters and the placing of orders for materials that will assure avoidance of delays. Any prospective delay should be immediately reported to me for possible assistance as to ways and means of eliminating same. In this regard you are reminded the delays due to the shortage of manpower are not excusable under the terms of the contract, as it has been determined that the manpower situation is not an unforeseeable contingency.
Consideration should be given to planning your construction schedule so as to complete Patients’ Buildings in sequence instead of completing all Patients’ Buildings concurrently, so that the Government may have the opportunity to take over each building as completed for occupancy as early as possible.
By letter of February 13, 1945, defendant’s superintendent of construction at Dearborn advised plaintiff, in part, as follows:
You are requested to submit a schedule of costs together with a progress chart, each of which are to be prepared as specified in the above mentioned article and executed in quadruplicate, to the Director of Construction, Veterans Administration, through this office.
12. By letter dated February 19,1945, plaintiff was given notice to proceed. This notice was received by plaintiff on February 21,1945, thereby fixing the date for the completion of the contract work within 400 calendar days as March 28, 1946.
The plaintiff’s work was performed within the original contract date, as extended by extensions of time issued from time to time by the VA. No liquidated damages were assessed or charged against the plaintiff.
13; Under date of March 1, 1945, plaintiff advised the Veterans’ Administration that there would be a delay in the delivery of piles at the project, and its letter stated, in part, as follows:
The time of completion of this project is completely dependent upon delivery of these piles. We request, therefore, that you do everything possible to obtain a directive to, be placed on the American Bolling Mill *523 Company increasing their April commitment in order to fill our requirements.
It is our present estimate that without such a directive and based upon the above delivery dates, that the final completion of this project will run approximately sixty days beyond the designated contract time.
14. On May 1,1945, plaintiff submitted its progress chart and a bar time chart. The progress chart was twofold: (1) progress scheduled on the basis of no allowance for the delay in receiving a pile directive due to delay in receipt of piles, and (2) progress scheduled on the basis of receiving a 60-day extension, due to the pile shortage. Plaintiff was granted this extension, but was not formally advised of the fact until September 2,1947, when Extension of Time No. 1 was issued by defendant.
By letter dated May 15,1945, plaintiff was advised that its construction progress chart and bar chart were approved.
15. Plaintiff’s plan of progress was to commence the construction of Unit C, proceed to Unit B, and then follow through with Building No. 19. Plaintiff subcontracted about 80 percent of the work involved in its contract, principally for excavation, concrete piling, steel structure, carpentry (forms for concrete work), plumbing and heating, electrical work, masonry and bricklaying, lathing and plastering, glazing, painting, marble setting and terrazzo bases and floors.
The work was scheduled to provide continuity for the various trades, so that while the exterior brickwork was going up on Unit C, it was beginning on Unit B, and, as it was finished on one building, interior partitions were then started following the installation of plumbing and mechanical work. In terms of actual construction, Unit B was approximately a month behind Unit C, and Building No. 19 was just behind that. This was in accordance with the suggestion contained in defendant’s letter to plaintiff, dated February 10,1945, the pertinent part of which is quoted in Finding 11.
16» Work required under the contract included preparation of the site, a normal amount of earth excavation, and the driving of piles to secure adequate foundations for the structures to be erected.
The nature of the construction work to be performed by plaintiff under the contract is indicated in the following:
*524 Buildings B and C were to constitute two 10-story wings of a main central building. Provision was made for a possible 4-story extension to each, building. Consequently, over the eleventh floor slab a temporary roof was to be constructed which was to be removed when the future extension was built. The original building was a small 4-story structure to which the two 10-story wings would be added in the shape of a “T” jutting out from either side. At the opposite end of the original building, a 3-story kitchen building, to be known as Building No. 19 was to be erected. All of these buildings were additions to the original structure.
Unit C was planned to have office space and laboratories on the first floor, with the second through the tenth floors being devoted to general hospital space.
Unit B was planned to have the first six floors as general office space without individual partitioned rooms, and the seventh through the tenth floors were to be general hospital space.
Building No. 19 was planned to be the kitchen building with storage and refrigeration space, dining room and kitchen.
17. By September 15, 1945, the woi'k of construction was well under way. On Unit B the work of erecting the steel framework of the building had progressed to the first and second floors when part of the erecting equipment broke and damaged both the mast and the crane boom. Procurement of replacement parts and the work of repairing the equipment delayed resumption of the work until September 28, 1945, on which day the erection of the steel framework for the third and fourth floors of the building was begun.
Construction of the steel framework for Unit B was completed on November 26, 1945. The work of “roughing in” the plumbing and electrical work, and the pouring of concrete floor slabs and the waterproofing of steel columns however, continued and was in progress during a period of negotiations concerning certain changes which defendant proposed to make in the building, as described in the findings which follow.
18. Under date of September 20,1945, defendant wrote the following letter to plaintiff:
*525 Reference is made to work being performed in connection with Contract VAc-1356.
It is requested that yon promptly submit a proposal covering the change in work involved as shown on the revised drawings listed below, one set of which is attached hereto and three sets forwarded under separate cover:
Architectural Drawings Nos. A1-3R, A1-4R, A1-5R and A1-6R.
Plumbing Drawings Nos. A1-33K, A1-34R, Al-89 and A1-37R.
Heating Drawings Nos. A1-38E,, A1-39R, A1-40R, A1-41R, A1-42R and A1-43R.
Ventilation Drawings No. A1-46R.
Electrical Drawings Nos. A1-51R, and A1-52B-.
These drawings cover interior changes on the second to sixth floors, inclusive, of Unit “B” and, also, the plumbing and heating work affected by these changes on floors below the second floor.
It is also requested that you submit a separate proposal covering the following changes in the thicknesses of the exterior walls of Units “B” and “C” and Building No. 19:
(1) Walls indicated as l'-0y2" thickness, change to l'-l".
(2) Walls indicated as l'-iy8" thickness, change to l'-l%" thickness.
Your proposal should be submitted promptly in such detail as to permit complete checking, with one copy forwarded to the Superintendent of Construction for his review and comments, which he is requested to make by copy of this letter.
Each proposal should be forwarded as soon as completed.
The changes proposed by the drawing submitted to plaintiff, as above indicated, would convert the general office space originally planned in Unit B into general hospital space, and thereby increase the bed capacity.
19. Defendant’s request of September 20, 1945, for an estimated cost on the proposed changes in Unit B, set out in the preceding finding, was held pending and was the subject of correspondence, excerpts of which follow:
(Plaintiff to defendant, October 16,1945)
Several of our subcontractors who are preparing estimates on the proposed change to Unit “B” have called me to question the matter of material which they have *526 on order. Particularly in the electrical and plumbing and beating contracts, there will be numerous items which now are on order, but in the event that we go ahead with the change these items will not be needed, and our subcontractors naturally will expect to be paid for them.
I cannot take the responsibility of telling our subcontractors to cancel this material, inasmuch as we have not yet been authorized to make the change. Will you please advise whether we should cancel orders for material that we now feel ivill not be used.
(Defendant to plaintiff, October 22,1945)
You are authorized to cancel all outstanding material orders for materials which were required for the original layout, but which will not be needed for the revised layout, except where unusual loss will accrue to the Government by virtue of the cutback or cancellation.
(Plaintiff to defendant, November 7, 1945)
In answer to your telegram of November 5th to our New York Office, regarding an approximate estimate on the changes to Unit B, we are as yet unable to make up an estimate on this, which is a major change, as we are awaiting proposals on several of the items from our subcontractors. As soon as these figures are all in, we will forward this information to you.
(Plaintiff to defendant, December 7,1945)
In answer to your letter of December 5th, in which you requested that we submit to you the proposals of our subcontractors for the change to Building “B” as we got them, we are enclosing proposals furnished us for the electrical work, hardware, masonry, terrazzo, the metal shelving,- and the millwork.
In connection with this change to Building “B”, as I stated to you some time ago, we are having difficulty in getting some of our subcontractors to quote us on the changes involved, notably the plaster contractor, who tells us that until 'he is assured he will not be required to pay the increased labor rates, or that in the event he is required to pay them he will be reimbursed to cover the increases he does not know how to estimate his work. This difficulty is encountered largely by the trades which involve considerable labor and less material, as in the. case of cement finish, plaster, etc.
*527 (Defendant to plaintiff, December 13, 1945)
Reference is made to letter of December 8,1945, from your Superintendent, Otto Werner, requesting information as to whether the changes in Unit B, increasing the bed capacity, have been authorized.
No authority to proceed has as yet been given.
This office has not to date received your proposal on the revised drawings forwarded to you by our letter of September 20, 1945. It is requested that you expedite submission of this proposal, only after receipt of which can authority to proceed be given.
20. On February 22, 1946, plaintiff submitted the following proposal to defendant:
Subject: Additional Bed Capacity, Unit UB”
For the changes shown on Drawings Nos. A1-3R, A1-4R, A1-5R, A1-6R, A1-33R, A1-34R, A189, Al-37R, A1-38R, A1-39R, A1-40R, A1-41R, A1-42R, A1-43R, A1-46R, A1-51R, and A1-52R, we request an addition to our contract in an amount not to exceed $152,000.00. This is in accordance with recent conferences in your central office, and voids our proposals of December 28, 1945, December 29, 1945, and February 11,1946.
This proposal is based on existing material costs and the wage rates as established in Article 27, amendments to Section 1G, general conditions of the specifications.
Extension of time on this change is to be determined later.
Defendant telegraphed its acceptance of this proposal, and authorized plaintiff to proceed with the work involved on March 13, 1946. Formal Change Order JJ in amount of $157,875.00, covering these changes was issued on January 28, 1947.
21. On June 18, 1946, defendant issued Change Order Y granting to plaintiff an extension of the contract time in connection with the above changes in Unit B. This change orders reads as follows:
With reference to your contract dated February 8, 1945 for construction of Additional Buildings and Utilities at Veterans Administration, Dearborn, Michigan, you are informed that owing to the following mentioned change in the work thereunder:
“Eliminating Regional Office space from first to sixth floor inclusive, and in lieu thereof constructing these floors in accordance with revised plans,” additional time of two hundred forty (240) calendar *528 days is hereby granted in accordance with the terms of the contract. The effect of this change upon the contract price will receive subsequent consideration.
The work involved in the above changes was effected without any suspension of work effort, and plaintiff integrated the new work with its existing work in whatever manner suited it.
22. Work proceeded, and on August 23,1946, the status of the work on the project was as follows:

Unit O

The exterior brickwork had been completed, except for an opening in the parapet wall on the top of the building, through which materials were unloaded from the hoist. The roof was being framed, but the penthouse had not been closed in. Glaziers were glazing the fifth floor windows.
The first floor was being used as storage space for materials and no finished interior work had been done thereon.
The plumbers and steamfitters had completed roughing in the plumbing and heating lines; frames and grilles were being set for radiator recesses; fixture anchors were being set; bathtub and drinking fountains were being set on the tenth floor; waste lines were being connected; and downspouts and vents were being set through the roof.
The electricians had completed the roughing in of the electrical work; ceiling wire was being pulled on the second floor, and piping in of ceiling outlets was being done on the fifth floor.
Interior glazed tile partitions were being erected on the seventh and eighth floors; tile and gypsum block partitions were being erected on the seventh, eighth, and tenth floors.
Metal shelves and cabinets were being erected on the seventh floor.
Metal laths and beads were being placed on the fourth and fifth floors. Plastering was being done on the third and fourth floors, with finish coat being placed on ceilings only. No plastered surfaces were ready for painting.

Unit B

The laying of face and backup brick was completed on the tenth floor on that day.
*529 Plumbers and steamfitters were roughing in hot and cold water pipes to fixtures, and they were placing steam and return lines to the radiators; steam traps were being connected; steampipes and hangers were being painted; sheet metal ducts were being fabricated and erected; and steam and return lines on the third floor were being covered.
The electricians were installing conduits for lights, radios, plugs, fans, etc. on the eighth and tenth floors.
No interior partition work had been started, and no lathing or plastering has been started.
The first floor was being used as storage space.

Buildmg No. 19

The fourth floor concrete slab was being stripped of forms; exterior limestone had been placed to approximately the window level on the first floor. No backup or face brick had been laid.
Sanitary and sewer mains were being started in the basement.
Some roughing in of electrical work had been started.

Other "Work

The forms subcontractor had started placing forms for connecting corridors AC and AB.
The paving subcontractor was pouring concrete in the parking area slab south of the laundry building, and the excavating subcontractor was delivering slag stabilizer for the roads and parking areas.
23. Notwithstanding the difficulties occasioned by the unexpected termination of the war against Japan on August 14, 1945, and the ensuing relaxation of wage controls, the plaintiff and its subcontractors had succeeded in fully manning the job, and the work, by the spring of 1946, was in full progress.
If the 60 days’ extension to which the plaintiff was entitled because of the shortage of piles, as well as the 240 days’ extension to which the plaintiff became entitled on March 13, 1946, under the VA’s notice to proceed with the changes in the bed capacity of unit “B”, is added to the original contract time of performance, the actual percentage of comple *530 tion on August 31, 1946, according to the contract progress report, was 66.5%.
STOP ORDER
24 By letter dated August 23,1946, the Veterans’ Administration advised plaintiff that changes were being contemplated, and requested that plaintiff hold up all work in certain areas pending the completion of revised drawings. This letter reads as follows:
Reference is made to conference held on August 22, 1946 in this office with a representative of your company concerning contemplated changes in construction, in connection with contract VAc-1356 at Dearborn, Michigan.
Revised drawings are being prepared covering certain changes in the following areas:
Unit “2?”, Main Building No. 1
First, third and tenth floors — Entire Areas
Second, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Floors — Areas south of columns Nos. 29-32
Roof — Area above tenth floor
Unit “¿7”, Main Building No. 1
Third Floor — Entire Area
Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Floors — Areas north of columns Nos. 121-124
Pending the completion of the revised drawings, it is requested that you hold up all work in areas usted above. It is contemplated that the drawings will be completed at an early date and you will be further advised in this matter.
Again, on August 27, 1946, the Veterans’ Administration advised plaintiff:
Reference is made to letter dated August 23,1946 from this office concerning contemplated changes in construction in connection with contract VAc-1356 at Dearborn, Michigan.
Revised drawings are being prepared covering certain changes in kitchen building No. 19. Pending completion of the revised drawings it is requested that you hold up all work on all floors of the kitchen building.
*531 It is contemplated that the drawings will be completed at an early date and you will be further advised in this manner [sic].
This stop order, which had disasterous effects on the plaintiff’s and its subcontractors’ existing work and the operations they were then pursuing, was issued without consultation with the YA’s representative on the job or the plaintiff to determine its wisdom and advisability. The stop order suspended 20 to 30 percent of the work on unit “C”, 40 to 50 percent of the work on unit “B”, and all of the work on Building No. 19.
25. On August 29, 1946, plaintiff sent the following telegram to the contracting officer:
AFTER CAREFUL SURVEY OF JOB COMPLIANCE WITH YOUR LETTERS MEANS THAT CONSTRUCTION FORCES MUST BE REDUCED AS FOLLOWS:
CARPENTERS FIFTY PERCENT BRICKLAYERS SEVENTY-FIVE PERCENT LATHERS AND PLASTERERS SEVENTY-FIVE PERCENT ELECTRICIANS SEVENTY-FIVE PERCENT STEAMFITTERS SIXTY-SEVEN PERCENT PLUMBERS ONE HUNDRED PERCENT AND LABORERS IN APPROXIMATE SAME PROPORTIONS STOP
PROCUREMENT OF LABOR TO PRESENT FORCE HAS BEEN TIME CONSUMING AND EXTREMELY EXPENSIVE. THIS ORDER TO SUSPEND WORK WILL WASTE THAT TIME AND EXPENSE AND MAKE PROCUREMENT AFTER RESUMPTION OF WORK EVEN MORE TIME CONSUMING AND EXPENSIVE IF NOT EVEN IMPOSSIBLE BUT CERTAINLY WILL HAVE ADVERSE EFFECT ON JOB PROGRESS AND COSTS. STOP WE ASSUME THAT YOU WERE FULLY AWARE THAT SUCH A CONDITION WOULD RESULT FROM OUR COMPLIANCE WITH THE INSTRUCTIONS CONTAINED IN THE REFERENCE LETTERS. STOP WE SHALL PROCEED IN ACCORDANCE WITH THOSE INSTRUCTIONS AS OF 4 : 30 P. M. AUGUST 30, 1946 UNLESS WE HEAR FROM YOU TO THE CONTRARY BEFORE SUCH TIME.
Defendant replied to the above telegram by letter dated August 30, 1946, the pertinent part of which reads as follows :
This Service is exerting every effort to expedite the revised layout of the areas where changes are involved, so that you may proceed with these changes at the earliest practicable date. In the meantime, you should *532 attempt to keep not less than your present force gainfully employed in the areas which are not to be affected by the revisions.
*****
If it develops changes here under consideration result in delaying your contract as a whole, or require additional work, such matters will be adjusted as provided for by the terms of the contract. The modification of the original plans has been administratively determined necessary for the proper operation of the Dearborn Hospital, and your full cooperation in effecting these changes in the most economical manner practicable is expected.
26. Plaintiff replied to the above letter by letter dated September 9, 1946, the pertinent part of which reads as follows:
As of the present writing, we have not been apprised of the nature, extent or scope of the contemplated work to which your letters of August 23rd, 1946, August 27th, 1946, and August 30th, 1946 refer. Consequently, we cannot agree with your statement that the proposed changes by your Administration, if they result in delay or require additional work, are matters which can properly be adjusted under the terms of the existing contract. From preliminary indications, particularly from the sweeping nature of your suspension orders, it appears that the work contemplated by the proposed changes may fall entirely beyond the general scope of our present contract.
27. Including the earlier changes (additional bed capacity), referred to in Finding 17, plaintiff’s work on the project was 66.5 percent completed on August 31,1946. At that time, plaintiff and its subcontractors had 273 men actively engaged in various tasks on the project, in the following categories:
Concrete and general work- 68
Masonry_ 60
Lathing and plastering- 36
Plumbing and heating- 35
Electrical work- 25
Form carpentry- 21
Concrete roads- 14
Damp-proofing_ 4
*533 Excavation and grading- ^
Glazing_ W
Shelving and cabinets_ M
Painting_ H
Total_273
28. Preliminary prints of the revised drawings, which are referred to in defendant’s letter of August 23,1946 (Finding 24) were forwarded to plaintiff by defendant with a letter dated September 6,1946, which reads, in part, as follows:
There are being sent to you under separate cover eight each of the following preliminary prints dated September 4,1946, of revised architectural and structural drawings showing the extent of the changes:
* * * * #
While it may be necessary to make slight modifications on the listed drawings, they define the areas in which changes are contemplated. You should, therefore, proceed with all contract work in areas in which no changes are indicated.
Final architectural, structural and mechanical working drawings are being prepared and will be forwarded to you at an early date.
29. The preliminary plans referred to in the above letter indicated the following changes:

Unit B

Morgue and embalming rooms, as well as general office space and handicraft workshops, were to be installed on the first floor.
A patients’ dining room, serving kitchens, dishwashing rooms, offices, and three wards, one for two beds, and two for four beds were to be installed on the third floor.
An operating suite was to be installed on the tenth floor.
On the second, and on the fourth floor through the ninth floor, a treatment room, a nourishment kitchen, a serving kitchen, a dishwashing room, unit laboratory room, doctors’ office space, and several single rooms, were to be installed on each floor. The floor space affected by the contemplated changes was less than 50 percent of the floor area.

*534
TJnit C

An X-ray therapy section, a dental laboratory, and two film rooms were to be installed on the first floor.
A patients’ dining room, serving kitchens, dishwashing rooms, an office, and a two-bed ward were to be installed on the third floor.
On the second floor, and on the fourth through the tenth floors, a treatment room, a nourishment kitchen, a serving kitchen, a dishwashing room, unit laboratory room, doctors’ office space, and several single rooms were to be installed on each floor. The floor space affected by the contemplated changes was less than a third of the floor space.

Building No. 19

The first floor was to be a refrigeration area; the second floor a library and recreation area; and the third floor a kitchen.
The plans contained a substantial amount of blank areas in which no changes were specifically indicated and under the terms of the letter of September 6, 1946, plaintiff was to proceed with the work called for therein according to the original plans.
30. On September 12, 1946, plaintiff advised defendant as follows:
. In -accordance with instructions from your office, our subcontractors and ourselves are proceeding with work in the unaffected areas, as outlined on preliminary-drawings dated September 4, 1946, for Buildings “B, ’ “C,” and 19.
I feel that it is necessaiy at this time to point out that in the absence of mechanical drawings showing runs of conduit, steam, water, and waste lines, etc., it is impossible to anticipate where openings must be left in the partitions which are now being erected, and it is the intention of this letter to point out that when mechanical drawings are completed it may be necessary to cut and chase partitions adjacent to the rooms in which changes áre to oe made.
It is our interpretation of the preliminary drawings that all rooms shown outlined are to be considered as *535 changed. If we do not hear from you to the contrary, we shall proceed on this basis.
31. When defendant had completed its new drawings and revised specifications, it forwarded them to plaintiff with a letter requesting that plaintiff prepare and submit detailed proposal covering the cost of the changes shown on the new drawings and revised specifications, copies of which were being forwarded to plaintiff under separate cover. This request is contained in the following letter which is dated September 20,1946:
Deference is made to our letter of September 6, 1946, concerning proposed changes in construction, contract VAc-1356, Dearborn, Michigan.
There are being sent you under separate cover twenty sets of plans and specifications covering the changes desired. A list of the drawings follows:

Main Building No. 1, Project No. 2019

A1-2R1
A1-3R1
A1-4R1
A1-5R1
A1-7R
A1-56R
A1-57R
A1-58R
A1-59R
Al-90
Al-91
Al-92
Al-93
Al-94
Al-95
Al-96
Al-97
Al-98
Al-99
Al-100
Al-101
Al-102
Al-103
Al-104
Al-105
Al-106
Al-107
Al-108
Al-109
Al-110

Eitolien and Dining Hall Building No. 19, Project No. 2019

19-1R1
19-7R1
19-11R1
19-12R1
19-74
19-75
19-76
19-77
19-78

Miscellaneous Details

87
88
It is requested that you submit at the earliest possible date detailed proposal covering cost of changes shown on the above drawings and revised specifications pertinent thereto.
32. Plaintiff received the drawings and specifications above referred to on October 1,1946, and acknowledged receipt of them by letter of the same date, which, in part, reads as follows:
We hereby acknowledge the receipt at noon today, by parcel post, of several sets of the 41 drawings and specifications enumerated in your letter, dated September 20, 1946. At this writing, we have had, of course, no opportunity whatsoever to examine these drawings and specifications. We propose to do so, however, as soon as possible, for the purpose of ascertaining the nature, extent and scope of the work necessitated by *536 the changes effected by said drawings and specifications, as well as for the purpose of submitting, in accordance with your request, a detailed proposal covering the cost thereof.
Plaintiff’s project superintendent received copies of the plans and specifications on the project site on October 3,1946.
33. On October 8, 1946, defendant’s senior project manager, George L. Peeples, came to the project for the purpose of planning economies in connection with the contemplated changes. On October 9, Peeples discussed the changes with plaintiff’s superintendent of construction, who advised him of a rough estimate of the costs attendant upon the changes. Peeples advised him that the estimate was greater than the funds available and that it would be necessary to revise the plans.
34. Following Mr. Peeples’ visit, and on October 18,1946, defendant’s superintendent of construction transmitted the following letter to plaintiff:
I am in receipt of a telegram from Central Office reading as follows:
“You are hereby authorized to direct F. H. McGraw Contract VAc-1356 to omit tearing out partitions on third floor of wings B and C and to direct Kuhne-Sim-mons Contract VAc-1394 and Mechanical Installations Contract VAc-1357 to disregard revised sketches and to proceed in accordance with existing contract requirements. The foregoing will enable all contractors to proceed with work for the present. Revised plans are being prepared showing:
1. Occupational Therapy in Occupational Therapy Building.
2. Physical and Hydro-Therapy in space now shown as Occupational Therapy on revised sketches.
3. Subsistence storage and attendants locker room to be relocated by revised drawings to be forwarded.
4. Recreation and libraries to be moved from second floor Building 19 to second floor rear wing of existing building.
5. Food preparation, Staff Dining Room and Attendants Dining Room to be located in Building 19 as originally planned.
6. Patients dining rooms to be located Third Floor, Rear Wing, in existing building.
*537 Bed space to occupy dining room space in Wings B & C as shown on revised sketches. _ Instruct contractor to proceed accordingly. The foregoing will permit work to proceed under McGrraw Contract VAc-1356 on Third Floor of Wings B and C and also permit work Kuhne-Simmons Contract VAc-1394 and Mechanical Installations Contract VAc-1357 in accordance with present contract requirements. Bevised drawings will be prepared as basis for a proposal making revised required changes. Acknowledge 11AB.”
35. A set of new drawings and revised specifications dated November 8,1946, was handed to plaintiff’s superintendent of construction on November 13,1946. It was these new drawings and specifications (later modified) that were finally adopted by Veterans’ Administration, and for which it issued instructions to plaintiff to proceed on January 27, 1947. These new drawings were numbered and identified as follows:

Unit B

2d floor_ A1-3R2 Architectural.
3d to 10th floors_ A1-5R2 Architectural.
Part basement, 1st, 2d to 10th and attic floors. Al-111 Plumbing.
Riser diagrams, notes and details __ Al-112
Additions to main building_ Al-115 Heating and ventilating.
2d to 10th floors_ Al-117 Electrical.

Unit C

1st floor_ A1-56R1 Architectural.
2d floor_ A1-57R1 Architectural.
3d to 10th floors_ A1-59R1 Architectural.
1st and 2d floors and radio details. A1-108R Electrical.
3d to 10th floors_ A1-110R Electrical.
Part basement, 1st notes and details. Al-113 Plumbing.
2d to 10th floors and attic; diagrams. Al-114 Plumbing.
Additions to main building_ Al-116 Heating and ventilating.

Units B and C

Riser diagrams. A1-107R Electrical.
36. On November 14, 1946, a representative of Veterans’ Administration visited at Dearborn and made certain additional corrections, deletions and alterations to the above *538 plans, and these were indicated in a letter dated November 14, 1946, addressed to plaintiff by defendant, which letter reads as follows:
In accordance with instructions received, you are directed to prepare proposals for changes as shown on revised drawings handed to your Mr. Werner, November 13,1946. It is desired that a separate proposal be submitted covering the cost of the Serving and Dish Washing Suite.
The following modifications have been made to the above mentioned drawings and your proposals will be governed accordingly:
1. All Treatment Rooms similar to Room 604 shown on Drawing A1-5R2 for all floors on both Units B and C of Main Building No. 1, to have the No. 3-P doors to corridor as required by drawings for existing contract.
2. All Nurses’ Stations, Unite B and C, to be constructed as required by drawings for existing contract.
3. The Cleric-Typist and Ward Secretary Room 237 and the 2 Doctors’ Offices, Rooms No. 237-A and No. 237-B, shown as typical for Units B and C on Plan Al-3R2 and A1-5R2 be constructed as shown thereon with the exception that the passage to Nurses’ Stations be omitted and no revisions to be made to the ducts, plumbing, etc., for the adjacent nurses’ stations.
4. The Ward Supply Rooms such as Room No. 609, Unit C, and the adjacent single rooms such as Rooms No. 608 and No. 610 shown on Drawing Al-59, to be constructed for all floors both Units B and C, as required by drawings for the existing contract and not as called for by drawings revised under date of November 8,1946.
In order that there will be no delay in construction, your very prompt submission of these proposals will be appreciated.
Plaintiff acknowledged receipt of the above letter on November 25, 1946, and advised defendant that it was then engaged in the preparation of the proposals and would submit them as soon as they were ready.
37. Plaintiff submitted its proposals dated January 3,1947, with a covering letter dated January 7, 1947, which states:
Attached hereto is our proposal covering certain alterations and changes to the subject project, as required by your letter of November 14,1946.
Under date of November 25, 1946, we acknowledged receipt of your November 14th letter and wrote further *539 as follows: “We also desire to advise you that we are likewise engaged in the task of computing all of the damages suffered and sustained by this Company as a result of your violation and breach of the subject contract so far, as they can be ascertained at the present time. The full extent thereof may not be known until the com-Eletion of the job. When finally ascertained, you will e furnished with a complete itemization thereof.”
Y ou will note from the attached proposal that we have included our overhead loss due to delay and also our added expenses due to loss of continuity. Both of these items can be substantiated at the present time and are therefore included. Also included are the extra costs and overhead sustained by our plastering contractor and by our masonry contractor. These additional costs likewise can be fully substantiated at the present time. All of the above are calculated to December 31, 1946, only.
All other damages suffered and sustained by this Company, as well as all additional damages, costs and overhead losses due to delay sustained by our subcontractors, will be the subject of a further claim when finally ascertained, in accordance with our letter of November 25, 1946, quoted above.
On January 27, 1947, defendant’s superintendent of construction forwarded the following letter to plaintiff:
In confirmation of verbal instructions given your Superintendent, Otto Werner, January 23, 1947, I am in receipt of instructions from Central Office as follows:
You are instructed to proceed with the alterations and changes to your Contract VAc-1356 described in specification 4466-H-A2 and as shown on drawings received by you November 13, 1946 from Central Office, and amended by letter from this office November 14,1946 regarding revisions of drawings dated November 8,1946, and as listed in your proposal dated January 3, 1947, including alternate A of electrical specifications. The exact amount to be paid you for the alterations and changes and any extension of contract time here involved to be determined later in accordance with terms of your contract with special reference to Article 3 thereof.
You are directed to proceed at once in accordance with the above.
38. On February 14, 1947, in response to the above letter, the plaintiff wrote the YA as follows:
*540 We are enclosing herewith copies of letters addressed to us by the Drake Avery Company, dated February 10,1947, and February 12,1947, respectively, and by Hat-zell & Buehler, Inc., dated February 8,1947, the contents of which letters are all self-explanatory.
As appears therefrom, unless the work is to be even further delayed, it is imperative that you check our proposal, dated January 3, 1947, covering this additional work as submitted and issue the requisite formal change order within thirty (30) days.
This request supplements previous request to the same effect, made verbally by our Mr. Doremus in your office on January 28, 1947.
In reply thereto, the following letter, dated February 19,1947, was received from the Veterans Administration:
Eeceipt is acknowledged of your letter dated February 14, 1947, concerning certain extensive alterations and changes in connection with contract VAc-1356 for construction of Additional Buildings and Utilities at Veterans Administration, Dearborn, Michigan, and the probability of further delay in the work if formal change order is not issued within thirty days. The statements made by certain of your subcontractors in the letters you enclosed have been noted.
It appears from the records of this office that the Supervising Superintendent of Construction at the Dearborn Hospital, in accordance with instructions, directed you by letter dated January 27, 1947, to proceed with the subject changes, pursuant to the provisions of article 3 of the contract.
In view of the complexity of the changes, and the resulting involvements in determining the “equitable adjustment” as contemplated by the contract, the modification in writing of the contract (issuance of change order) of necessity, must be deferred until such time as accurate check of the estimated cost for making the change can be completed.
Since, however, quoting from article 3 of the contract, viz:
“* * * nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed * *
it is not seen wherein “the work is to be even further delayed” unless the Veterans Administration issues “the requisite formal change order within thirty (30) days.”
In this latter connection, you may feel assured that appropriate change order modifying the contract price *541 and/or time due to this change in work will be issued at as early a date as is found practicable.
In response, the contractor advised the Veterans Administration, by a letter dated February 25, 1947, as follows:
We herewith acknowledge the receipt of your letter dated February 19,1947, responding to our letter dated February 14, 1947.
As appears from your letter, it is your claim that, in proceeding with the subject changes, we are subject to the provisions of article 3 of the contract. We have heretofore denied, and we hereby emphatically reiterate the denial, that article 3 of the contract is in anywise applicable to the subject changes, and the delays, damages and losses which have resulted therefrom.
We have repeatedly advised you in the past that the subject changes, together with the delays involved therein, were wholly beyond the scope of the existing contract, and constituted an inexcusable interference with, and breach of, our contractual rights. Under the circumstances, it is our position that the assumptions contained in your letter of February 19,1947, are entirely erroneous, and that neither article 3, nor any of the provisions contained therein, have any application whatsoever to the subject changes, or the delays, losses and damages involved therein to which we were subjected.
39. During the period from August 23,1946, when defendant instructed plaintiff to hold up all work in certain areas (Finding 24), to January 29, 1947, when plaintiff received defendant’s instructions to proceed with the work as modified by the new drawings and revised specifications furnished to it on November 13, 1946, as amended by letter advice of November 14,1946, plaintiff and its subcontractors proceeded with operations on the project insofar as they could do so. Plaintiff’s daily construction reports for the period indicate that the following number of men were employed as at the end of each month:

1946

August -266
September -243
October_190
November_126
December_139
*542 The stop order forced the plaintiff and its subcontractors to discharge many of their skilled employees. During this period skilled manpower was difficult to replace and the remanning of the job caused delay and expense to the plaintiff and its subcontractors.
40. On the original plan the tenth floor of Unit B was designed for use as general hospital space. The Veterans’ Administration later determined that an operating suite should be installed on it, and when the revised drawings and specifications were completed, they provided that the suite would include the following accommodations:
Sterilizing room, scrub room, operating room No. 4, operating room No. 3, a scrub room, an equipment closet, a sterilizing room, a scrub room, operating room No. 2, operating room No. 1, a scrub room, a sterilizing room, equipment closet, instrument room, sterilizing cabinets, an anesthesia equipment room, an equipment closet, a nurses’ room, and a corridor going down.
That portion of the tenth floor on which the above were to be constructed was directly over and above so-called “unrestricted” areas of the floors below.
41. Mechanical installations necessary to service the above accommodations originated in the basement of the building and they affected each floor through which they were required to go; they include the following:
Plumbing lines; risers and pipes to the various fixtures in the sterilizing rooms, operating rooms, scrub rooms, and equipment closets; drain lines for transverse fixtures in the ceiling of the ninth floor; hot and cold water risers; drainage from the tenth floor fixtures, heating risers for the convectors in the exterior wall; lines and pipes for the water necessitated by the air-conditioning equipment; and risers, lines and pipes to furnish electrical power for the facilities.
42. Plaintiff’s original plan of procedure, and its arrangements made under that plan, could not be fully carried out after August 23,1946, because of defendant’s order to plaintiff to hold up all work on certain areas in contemplation of alterations and changes that were to be made, and for which new drawings and revised specifications were being prepared.
Defendant forwarded preliminary prints of these new *543 drawings to plaintiff on September 6, 1946 (Finding 28). These preliminary prints defined the areas in which it was contemplated changes would be made, but they contained no mechanical, structural, architectural, or other details, and without such detail drawings plaintiff could not know the nature and extent of the mechanical work to be installed in those portions of the first, third and tenth floors which corresponded, in geographical location, to the “unaffected” areas of the lower and upper floors.
Efforts made by the plaintiff to procure a clarification of the term “unrestricted” area and a specific designation of work which it could proceed to accomplish therein were not very successful as indicated by the following excerpts from a telegram and some letters to the plaintiff from the defendant:
[Telegram dated August 29,1946]
INTENT OF CENTRAL OFFICE LETTER TWENTT THIRD TO CONTRACTOR WAS TO STOP ALL WORK ON ENTIRE FLOOR AREA LISTED
[Letter dated October 26,1946]
It would be inadvisable for this office at this time to designate certain walls which will not interfere with future mechanical work.
[Letter dated October 31,1946]
With reference to your letter of October 30, 1946, covering white coating of walls on all floors in unit “C”. You are wrong in you statements in this letter, as this office, at this time, is not in position to make any decision as to where changes will or will not be made.
[Letter dated November 9,1946]
If you use color 12A for the third coat, you will be doing so on your own, as this office does not know, at this writing, the finish wall colors.
The VA’s representative on the job did not know any more about the proposed changes or the stop order and its scope or intended duration than the plaintiff.
It would have been possible, to a certain extent, for plaintiff to have proceeded with mechanical installations under the original plans in those “unaffected” areas of the lower and upper floors, but defendant concedes that plaintiff would have been “taking a chance” in doing so and would very possibly have been “stuck”, if it had done so.
*544 43- Defendant’s stoppage of a considerable proportion of plantiff’s work for a period of over five months, at the period of peak performance by the plaintiff, was an unnecessary and unreasonable interference with and delay of plaintiff’s work, and caused plaintiff substantial damage. Defendant has made a unilateral allowance, as above set out, to plaintiff for the costs of the changed work. Such allowance, however, expressly excludes any sum for the damages caused plaintiff by the stoppage, on the ground that the contracting officer and head of the department were without authority to allow damages for a breach of contract.
INCREASED WAGES PAID
44. Article 27 of General Conditions of the contract specifications, as amended, provided:
article 27. Minimum Bates of Wages.
The following schedule furnishes the minimum hourly rates of wages which may be paid to the various laborers and mechanics employed directly upon the site of the work embraced by this specification; the rates having been determined by the Secretary of Labor, in accordance with Public Act No. 403, 74th Congress, approved August 30,1935, to be the prevailing rates for the corresponding classes of laborers and mechanics in the locality where this work is to be performed.
While the wage rates shown are the minimum rates required by these specifications to be paid during the life of the contract, it is the responsibility of bidders to inform themselves as to the local labor conditions and prospective changes, including any existing or pending collective bargaining agreements which may provide for rates in excess of those predetermined by the Secretary of Labor.
45. At the time plaintiff’s contract was executed on February 8,1945, certain wartime regulations concerning wages and wage control were in effect. The nature of those which governed the building and construction industry, and pertinent excerpts therefrom, are as follows:
The Wage Stabilization Agreement of May 22, 1942, provided in part:
It is agreed between the contracting agencies of the United States Government and the Building and Construction Trades Department of the American Federa *545 tion of Labor that, on all war construction work done for or financed by the United States (except non-Federal construction where State laws govern wage rates) in the continental United States, the wage rates paid under collective bargaining agreements as of July 1, 1942 shall remain in full force and effect for a period of at least one year after that date and, subject to annual renewal of this agreement for the duration of the war. Except as hereafter provided, all renewals of collective bargaining agreements will contain the rates paid as of July 1,1942.
*****
A wage adjustment Board will be created to determine whether a wage adjustment should be made under this paragraph and to fix the amount of any adjustment which is made. In its determination it shall give consideration to existing collective bargaining agreements.
On May 29,1942, the Secretary of Labor, by Administrative Order No. 101, established the Wage Adjustment Board for the building and construction industry in the United States Department of Labor. The Board’s powers were set out, in part, as follows:
2. The Board shall have power to investigate and to recommend an adjustment or wage rates under the above agreement of the labor organizations in the building construction industry. It shall consider requests for wage adjustments when presented by local labor organizations with the approval of the international or national labor organization and submitted through and approved by the Building Trades Department of the American Federation of Labor. It shall have power to make the necessary rules of procedure. The Board’s recommendation with respect to a request for wage adjustment shall be transmitted to the Secretary of Labor, to the Building Trades Department, and to any interested contracting agency of the United States.
On November 13, 1942, Administrative Order No. 101 was amended by Supplement No. 1 by adding thereto the following:
Section 2 (a) — In addition to the powers vested in the Board by section 2 of this Order, the Board shall consider and act upon requests for any wage adjustments on projects done for or financed by the Government agencies which are parties to the Wage Stabiliza *546 tion Agreement of May 22,1942, or which shall become parties thereto, when presented by employers, Government contracting agencies or any group ox workers not specified in section 2 of this Order, as well as when presented by unions, including wage rates which are not prescribed by collective bargaining agreements. Nothing in this section shall change the procedure established in section 2 for the presentation of requests for wage adjustments by local labor organizations therein described.
Executive Order No. 9250, issued October 3, 1942, provided in pertinent part:
titee n

Wage and Salary Stabilization Policy

1. No increases in wage rates, granted as a result of voluntary agreement, collective bargaining, conciliation, arbitration, or otherwise, and no decreases in wage rates, shall be authorized unless notice of such increases or decreases shall have been filed with the National War Labor Board and unless the National War Labor Board has approved such increases or decreases.
2. The National War Labor Board shall not approve any increases in the wage rates prevailing on September 15, 1942, unless such increase is necessary to correct maladjustments or inequalities, to eliminate substand-ards of living, to correct gross inequities, or to aid in the effective prosecution of the war.
*****
TITEE HI
*****
3.No provision with respect to wages contained in any labor agreement between employers and employees (including the * * * Wage Stabilization Agreement of the Building Construction Industry arrived at May 22, 1942) which is inconsistent with the policy herein enunciated or hereafter formulated by the Director shall be enforced except with the approval of the National War Labor Board within the provisions of this Order. The National War Labor Board shall permit the * * * Wage Adjustment Board for the Building Construction Industry, both of which are provided for in the foregoing agreements, to continue to perform their func *547 tions therein set forth, except insofar as any of them is inconsistent with the terms of this Order.
* sK # ' * *
By General Order No. 13-A, adopted December 14,1942, it was provided that applications for approval of revisions of wage rates subject to the Wage Stabilization Agreement of May 22, 1942, should be submitted for approval to the Wage Adjustment Board in lieu of the National War Labor Board.
On October 13, 1943, General Order No. 13-A was repealed and a new General Order No. 13 promulgated, wherein it was provided, in part:
C. Applications for approval of revision of rates subject to the Wage Stabilization Agreement of May 22, 1942, which revision would otherwise require the approval of the National War Labor Board, shall be submitted for approval of the Wage Adjustment Board. In acting upon such applications, the Wage Adjustment Board shall be subject both to the provisions of the Wage Stabilization Agreement of May 22, 1942, and to the requirements of the national wage stabilization program, as set forth in paragraph F hereof.
* # # * $
J. (1) All applications for the voluntary adjustment or revision of wage rates shall contain, or the Wage Adjustment Board shall, before acting on the application, procure, a statement by the employer as to whether the adjustment or revision if approved (a) may furnish the basis to increase price ceilings or (b) may furnish the basis for an application by the employer for an increase to the government in the price of any product or service. If the statement is in the affirmative as to (a), the Wage Adjustment Board shall send to the Office of Price Administration a copy of the application and a copy of its ruling at the time of issuance thereof. If the statement is in the affirmative as to (b) and an adjustment of the type that requires the approval of the Economic Stabilization Director is approved by the Wage Adjustment Board, the Wage Adjustment Board shall send to the appropriate procurement agency of the government a copy of its ruling at the time of issuance thereof.
46. On February 22, 1943, the Veterans’ Administration notified the Wage Adjustment Board that it could “consider *548 this letter as a ratification by the Veterans Administration of the Wage Stabilization Agreement of May 22,1942.”
47. On August 14, 1945, which was during the period of performance of plaintiff’s contract, Japan unconditionally surrendered, and thereafter many of the wartime regulations were relaxed by amendment.
On August 18, 1945, Executive Order 9599 was issued which provided, in pertinent part:
I
1. The guiding policies of all departments and agencies of the Government concerned with the problems arising out of the transition from war to peace shall be: *****
B. To continue the stabilization of the economy as authorized and directed by the Emergency Price Control Act of 1942, as amended, and the Stabilization Act of 1942, as amended, (1) by using all powers conferred therein and all other lawful means to prevent either inflation or deflation; and (2) while so doing, by making whatever modifications in controls over prices, wages, materials and facilities are necessary for an orderly transition from war to peace, and
C. To move as rapidly as possible without endangering the stability of the economy toward the removal of price, wage, production and other controls and toward the restoration of collective bargaining and the free market.
í|¡
IV
1. The National War Labor Board, and such other agencies as may be designated by the Director of Economic Stabilization * * * are authorized to provide that employers may, through collective bargaining * * * make wage or salary increases without the necessity of obtaining approval therefor, upon the condition that such increases * * * in the case of products or services being furnished under contract with a federal procurement agency, will not increase the costs to the United States.
2 * * *
Where the National War Labor Board or other designated agency * * * shall have reason to believe that a proposed wage or salary increase will require a change in *549 the price ceiling of the commodity or service involved, such proposed increase, if approved by the National War Labor Board * * * shall become effective only if also approved by the Director of Economic Stabilization.
48. On August 20, 1945, the National War Labor Board issued General Order No. 40 permitting employers to make wage or salary increases without the necessity of obtaining its approval unless it would be the basis for an increase in price ceilings or an increase to the Government for services or products being supplied to it under contract. On August 23, 1945 by General Order No. 41, the provisions of General Order No. 40 were determined not to apply to the building and construction industry and all wage increases had to be submitted to the Wage Adjustment Board for approval, which was thereby, pursuant to Executive Order 9599, authorized to approve such wage increases as were necessary to correct maladjustments or inequities which would interfere with the effective transition to a peacetime economy.
On October 30, 1945, Executive Order 9651 was issued, amending Executive Order No. 9599, permitting wage increases in peitinent part to (1) equalize the increase in the cost of living between January 1941, and September 1945.
49. On November 27, 1945, plaintiff wrote to defendant, in part, as follows:
As a result of the unexpectedly rapid termination of hostilities and the ensuing termination of wage control, the undersigned company, as well as its subcontractors upon the job, is now being confronted with labor claims for wage rates in excess of those predetermined by the Secretary of Labor for the subject contract, as well as the pre-war scale of double time for overtime. We have done our best to keep this situation under control, but it is apparent that we cannot do so any longer. Unless we and our subcontractors agree to pay higher wage rates, as well as the higher overtime scale, than those specified in the subject contract, the men will leave the job and the project will suffer accordingly.
Consequently, we are calling your attention to this situation for the purpose of obtaining your consent to payment of the increased rates, and for the further purpose of securing, in view of the unusual and unanticipated conditions resulting from the termination of hostilities, a modification of our contract to cover the increase in cost resulting from such conditions.
*550 On November 29, 1945, plaintiff advised defendant as follows:
I am enclosing herewith copies of notices we have received today from the various Trade Unions, covering the increased rates for laborers, stone masons, bricklayers, plasterers, and reinforcing men. As you will note, the increases have been awarded by the Wage Adjustment Board with the provision that they apply on non-Federal work.
This further aggravates the situation regarding the availability of labor on this job, as outlined to you in my letter of November 27th. In addition to the problem of not being permitted to pay double time demanded by the men for overtime, we now are faced with higher rates officially approved for non-Federal private work.
In discussing this with the various labor representatives, I have been informed that they can give me no further assurances that they will be able to keep men on this job. The condition has been bad enough, as you well know, with the job from ten to twenty percent manned as it is. Unless something is done to alleviate this condition, I have no assurance that we will have any men on the job next week.
It is well known that private builders have been paying men far in excess of the established rates, for the past several months. During this time, however, with the Union rates as they were established, we were able, by continuous effort and pressure on the Unions, to keep a skeleton force on this job. Now, however, when the increased rate actually has been established by the Labor Department, we no longer can exert this pressure on either the Unions or the men, and only authorization from you to pay this increase will result in a completely manned job.
50. By telegram dated December 3, 1945, plaintiff advised defendant:
IN ACCORDANCE WITH TERMS OF our CONTRACT VAC-1356, WE HAVE BEEN MAKING EVERY POSSIBLE EFFORT TO CARRY ON WORK ON A SIX DAY PER WEEK BASIS AND AT THE SAME TIME MAINTAIN THE WAGE SCALE AS SET FORTH IN CONTRACT AND IN COMPLIANCE WITH ORDERS OF NATIONAL WAR LABOR BOARD, AS DESCRIBED IN MY LETTERS OF NOVEMBER 27 AND NOVEMBER 29 TO YOUR REPRESENTATIVE ON JOB.
WE WERE ABLE TO KEEP A SKELETON FORCE ON JOB IN THE FACE OF EXTREME LABOR SHORTAGE IN THIS AREA SO LONG AS ESTABLISHED WAGE RATES REMAINED IN EFFECT. NOW, *551 HOWEVER, WITH WAGE ADJUSTMENT BOARD’S APPOVAL, RATES HAVE BEEN INCREASED ON NON-EEDERAL WORK. WE CAN NO LONGER EXERT PRESSURE ON UNIONS TO KEEP MEN ON THIS JOB IN THE PACE OP HIGHER RATES ELSEWHERE.
THIS PACT, TOGETHER WITH THE UNIVERSAL DEMAND FOR DOUBLE TIME POR OVERTIME, HAS RESULTED IN A PRACTICAL SHUTDOWN ON SATURDAY, DECEMBER 1, AS MECHANICS REFUSED TO WORK POR TIME AND ONE-HALF. MEN WILL NOT REMAIN ON THE JOB IF WE WORK ONLY FIVE DAYS, AND ONLY AUTHORITY FROM YOU TO PAY DOUBLE TIME AS WELL AS THE INCREASED RATES NOW DEMANDED WILL RESULT IN A FULLY MANNED JOB.
51. On December 4, 1945, defendant’s contracting officer sent the following telegram to plaintiff:
RE URTEL 3RD ALSO LETTER TO SUPERINTENDENT OF CONSTRUCTION NOVEMBER 27 RE WAGE RATES, CONTRACT VAC-13 5 6 IF YOU CONSIDER IT NECESSARY TO RAISE YOUR CURRENT WAGE RATES TO THOSE AUTHORIZED BY THE WAGE ADJUSTMENT BOARD TO PROPERLY PROSECUTE YOUR WORK AND IF SAME NEED TO BE AUTHORIZED THIS MATTER SHOULD BE TAKEN UP AT ONCE WITH THE WAGE ADJUSTMENT BOARD, WASHINGTON, D. C. THIS ADMINISTRATION IS WITHOUT AUTHORITY TO COMPENSATE YOU FOR INCREASE IN WAGE RATES FOUND NECESSARY FOR YOU TO PAY IN ORDER TO COMPLETE YOUR CONTRACT. THE MATTER OF PAYING DOUBLE TIME FOR OVERTIME MIGHT BE FOUND NECESSARY BY YOU TO PROPERLY PROSECUTE YOUR WORK. HOWEVER IF [sic] THIS ADMINISTRATION CANNOT REIMBURSE YOU FOR SUCH PAYMENTS. IF YOU ADVISE THIS OFFICE OF ANY CONTACTS WITH THE WAGE ADJUSTMENT BOARD EFFORTS WILL BE MADE TO EXPEDITE ACTION.
By letter dated January 3, 1946, plaintiff appealed to General Omar Bradley, Administrator of the Veterans’ Administration, from the position taken by the defendant’s contracting officer. Beceipt of this appeal was acknowledged by letter dated January 10,1946.
52. On December 5,1945, the Stabilization Administrator issued Supplementary Wage and Salary Begulations, which provided, in part:
Section 406. Effect of approved increases in determining costs to the United States. In the case of products or services being furnished under contract with a federal procurement agency, such agency may take into consideration, on the same basis as other factors *552 affecting costs, any wage or salary increase which, is approved under the provisions of these regulations. Nothing in these regulations, however, shall be construed as authorizing or requiring any increase in costs to the United States which is not required by the applicable procurement contract.
53. By letter dated December 6,1945, plaintiff wrote to the Wage Adjustment Board, in part, as follows:
As a result of the increased wages authorized on non-Federal work, it has been impossible to obtain adequate labor on this Veterans job. In addition, the fact that we are not authorized to pay double time for overtime also contributes to our difficulties.
It seems to us that the Board should do a little more than it has already done in these orders of October 31 and November 14, 1945, in order to make it possible for the Veterans Administration Hospital to be constructed at the earliest possible moment. We respectfully suggest that it should authorize as maximum rates the same rates that it has authorized on non-Federal jobs. The Secretary of Labor, under Section 276a of Title 40, U. S. C. A. (Davis-Bacon Act), only has authority to fix minkmmn and prevailing wages, whereas your Board has the authority to fix the maximum wages. We, therefore, request that you enlarge the scope of your orders of October 31 and November 14, 1945, so as to authorize payment even on Federal jobs of the maximum wages which you have authorized in those orders and double time for overtime which you have authorized on non-Federal jobs.
54. By letter dated December 6, 1945, plaintiff wrote to the Secretary of Labor, in part, as follows:
For some months it has been impossible to obtain adequate help with which to do this job because of the higher rates officially approved for non-Federal private work in the area where this hospital is being constructed.
We annex hereto and make a part hereof three orders, one of them dated October 31, 1945, and two of them dated November 14, 1945, issued by the Wage Adjustment Board for building construction work in the area in which this hospital is to be erected. Each of these orders contains the following sentence:
“It was also the decision of the Board to recommend recognition of the above rates in the next wage determination issued by the Secretary óf Labor pursuant to *553 the amended Davis-Bacon Act, with, respect to federal building construction in the designated areas.”
So far as we are aware, no such determination has been made by you pursuant to that suggestion. As a result, the working men do not want to work on this Veterans Hospital and instead go to work on private construction jobs. The result has been considerable delay in the erection of this hospital which, as you know, is so vitally needed.
* * * *
We, therefore, respectfully request that you issue a determination at the very earliest possible moment setting forth the fact that the prevailing wages for this area are those authorized by the Wage Adjustment Board in the orders referred to above.
55. By telegram dated December 28, 1945, the Wage Adjustment Board authorized plaintiff to put into effect the rates of wages referred to by plaintiff. The last sentence of the telegram reads:
THE FOREGOING RULING MAY NOT BE PLACED IN EEEECT UNLESS NO ADDITIONAL COST TO GOVERNMENT IS INVOLVED OR UNLESS APPROVED BY DIRECTOR OE ECONOMIC STABILIZATION
56. By letter dated January 3, 1946, plaintiff appealed to the Director of Economic Stabilization, relative to that part of the Wage Stabilization Board’s telegram of December 28, 1945, quoted above. This letter in pertinent part reads:
It will be noted that the Wage Adjustment Board specifically stipulates that: “The foregoing ruling may not be placed in effect unless no additional cost to government is involved or unless approved by Director of Economic StabilizationIt is the purpose of this communication to obtain the requisite approval stipulated by the Wage Adjustment Board as a condition precedent to the efficacy of its ruling.
57. On January 7, 1946, the Stabilization Administrator replied to plaintiff’s letter of January 3, stating, in part:
The increases mentioned in your letter have not been submitted to this office for approval. Under the December 5, 1945 Begulation of this office certain designated types of wage increases may be taken into consideration by procurement agencies in determining increased costs to the government. For your informa *554 tion in that respect, I enclose copy of the Regulations and direct your attention in particular to Sections 301 to 306 thereof. However, it should be noted that even where an increase has been approved under our Regulations it does not necessarily follow that the increase must be reflected in costs to the United States. The rule in this connection is set forth in Section 406 of our Regulations.
Section 406 of the Regulations referred to is quoted in Finding 52 above.
58. By letter dated January IT, 1946, plaintiff’s superintendent advised defendant’s superintendent of construction, in part:
* * * I have been notified today by my New York Office that we are now authorized by the Wage Adjustment Board and the Veterans Administration in Washington to pay these increases on this job.
We are therefore, going on record to the effect that, starting today, J anuary IT, 1946, these increases will go into effect.
By letter dated January 18,1946, plaintiff advised defendant’s contracting officer that the wage increase was being put into effect, and that—
Such action on our part is being taken in accordance with our conference and telephone discussion with Mr. Moore, it being understood that the limitations contained in the last sentence of the telegram from Mr. Moore do not apply and that we are not foreclosed, by our action, from asserting any subsequent claim for an increased compensation to this company because of the payment of the increased rate.
By letter dated January 30,1946, defendant’s contracting officer wrote plaintiff:
Reference is made to your letter of J anuary 18, 1946, and recent conference in this office concerning wage rates in connection with contract VAc-1356, Dearborn, Michigan.
The contents of your letter have been noted and the letter placed in the files of this office.
There is no evidence indicating that either the VA or its job representatives promised the plaintiff that it would be reimbursed for any wage increases.
*555 59. On March 8,1946, the Economic Stabilization Director promulgated new regulations which superseded prior regulations on this subject. Section 405 of that regulation provided:
Effect of approved increases in determining costs to the United States. In the case of products or services being furnished under contract with a federal procurement agency, such agency may take into consideration, on the same basis as other factors affecting costs, any wage or salary increase which is approved under the provisions of these regulations: Provided, however, that no wage or salary increase which was made on or before February 13, 1946, and was unapproved on that date, shall be a basis for reimbursement under such a contract unless the procurement agency administering the contract finds that reimbursement is necessary to prevent hardship. Nothing in these regulations, however, shall be construed as authorizing or requiring any increase in costs to the United States which is not required by the applicable procurement contract.
60. On March 13, 1946, plaintiff requested the Wage Adjustment Board to permit N. DeCample Company, plaintiff’s lathing and plastering subcontractor, to increase the wages of metal lathers who were needed on the project the same wage increase that had been granted on January 30, 1946, to metal lathers working on non-Federal jobs. By telegram dated March 3, 1946, the Wage Adjustment Board granted plaintiff permission to put into effect the wage increases for lathers and plasterers.
61. On May 17,1946, plaintiff requested the Wage Adjustment Board to permit it to put into effect the wage increase granted to carpenters on non-Federal jobs. This request was granted on May 27, effective as of May 17.
On May 23, 1946, plaintiff requested the Wage Adjustment Board to permit an increase in wages for cement finishers and plasterers’ tenders which had been granted for non-Federal jobs. On June 13 this request was granted effective as of May 23.
62. On May 29,1946, plaintiff requested the Wage Adjustment Board for permission to pay painters the wage increases which had been granted for non-Federal jobs. This request was granted on June 11, at which time the Board *556 advised plaintiff that it was not possible to grant blanket authorization to plaintiff to pay any rates that might be established for non-Federal work in the Detroit area.
63. The record contains many complaints by plaintiff of difficulties involved in securing adequate labor. It is reasonable to assume that this circumstance added to plaintiff’s costs, but the record affords no means of determining in what amount.
64. The plaintiff is a competent, experienced and internationally known engineering and construction company which has successfully completed many substantial engineering and construction projects for various Federal, State and Municipal departments and agencies and private companies. The VA stated that constructionwise the Dearborn project was an excellent job, that the plaintiff’s personnel on the job were skilled and competent.
ADMINISTRATIVE ACTION
65. By letter dated February 14, 1947, plaintiff requested that action be taken on its proposal for changes connected with the work ordered under the proceed order arising out of the stop order, within 30 days, and enclosing therewith copies of letters from Drake Avery Company and Hatzel and Buehler to the same effect.
By letter dated February 19, 1947, defendant advised plaintiff that the above letter and its enclosures from the subcontractors had been noted and that article 3 required them to continue work and further than an appropriate change order modifying the contract price and/or time would be issued as soon as practicable. Said letter is set forth in full in finding 38.
Plaintiff acknowledged receipt of this letter on February 25,1947, and advised defendant as follows:
We herewith acknowledge the receipt of your letter dated February 19,1947, responding to our letter dated February 14,1947.
As appears from your letter, it is your claim that, in proceeding with the subject changes, we are subject to the provisions of article 3 of the contract. We have heretofore denied, and we hereby emphatically reiterate the denial, that article 3 of the contract is in anywise ap *557 plicable to tlie subject changes, and the delays, damages, and losses which have resulted therefrom.
We have repeatedly advised you in the past that the subject changes, together with the delays involved therein, were wholly beyond the scope of the existing contract, and constituted an inexcusable interference with, and breach of, our contractual rights. Under the circumstances, it is our position that the assumptions contained in your letter of February 19,1947, are entirely erroneous, and that neither article 3, nor any of the provisions contained therein, have any application whatsoever to the subject changes, or the delays, losses and damages involved therein to which we were subjected.
66. Plaintiff submitted a document dated April 21, 1947, entitled “memdRandum for the Veterans’ Administrator” to defendant as a supplement to its letter dated February 11, 1947, and set forth therein that defendant had breached its contract by issuing “a stop order on August 23, 1946, and caused cessation of a substantial part of all work on Units B and C and Building No. 19 at Dearborn for more than five months,” that defendant was contractually liable to plaintiff for all wage increases granted by the Wage Adjustment Board, and that defendant was liable for increased material costs caused by defendant’s “breach of the contract.”
By letter dated May 21, 1947, General Bradley, Administrator of the Veterans’ Administration, replied to plaintiff:
I have your memorandum dated April 21, 1947, concerning the losses claimed by you to be involved in the construction of the above-mentioned hospital.
A study of your memorandum discloses that you have elected to make your claim one for damages for breach of contract. Neither the contracting officer nor the Administrator of Veterans’ Affairs, on proper appeal, has the power to determine a contractor’s claim for damages for breach of contract. Section 5 of Executive Order No. 6166, dated June 10, 1933 (5 U. S. C. A. #123, Note), referred to on page 2 of your memorandum, without arguing what is the effect thereof, is not considered as conferring any authority upon the Veterans’ Administration.
However, it is always the desire of the Veterans’ Administration to deal in a fair and equitable manner *558 with its contractors within the authority conferred upon it by the law and the contract, and, if you so desire, your claims may be submitted to the Veterans’ Administration, itemized and supported by such documents as you may think proper. Upon the receipt of your itemized claims a conference may be arranged and the Veterans’ Administration will be in a position to point out to you which, in its opinion, resulting from changes in the drawings and/or specifications causing an increase in the amount due under the contract or in the time required for its performance, can be equitably adjusted, and which, if any, must be a matter of suit by you to determine your right to recover therefor.
67. By letter dated August 11, 1947, entitled “Contract Extension of Time,” plaintiff advised defendant that it had requested a 60-day extension because of the delay in the delivery of steel piles caused by the failure of the War Production Board to grant a directive to increase the allotment of steel to plaintiff’s supplier, and that Change Order Y granted an extension of 240 days because of the change in the bed capacity in Unit B, and that the effects of the partial stop order of August 23, 1946, including delays concerning new equipment for Building 19 under the changes would bring the estimated date of completion to March 3, 1946. The plaintiff then stated:
The entire job from its beginning was delayed by extreme labor shortages in structural ironworkers, carpenters, reinforcing men, bricklayers, stone setters, terrazzo workers, and plasterers, particularly. The shortage of mechanics in the Detroit area was aggravated considerably, insofar as this job was concerned, by the fact that, until the removal of Wage Adjustment Board controls, wage increases granted to various trades were declared payable on non-Federal jobs only. This reacted to our disadvantage by causing mechanics who were available to seek employment on private work, where higher wages were permitted to be paid. It was only by strenuous efforts on our part and continuous pressure on the Unions, through their international offices, that we were able to complete the various operations. The foregoing has been thoroughly documented as the occasions arose, and your office has been kept completely informed concerning labor developments, and *559 it is not thought necessary to enter any more deeply into this subject.
This Company feels that, in view of the seriousness of the various delays herein described, the contract completion date should be advanced to May 3, 1948, from the existing contract completion date of November 23, 1946. This is arrived at by adding to the estimated finishing date of March 3, 1948, the sixty days requested on May 9,1945, for the delay in delivery of piles.
The plaintiff had been advised by letter dated February 10,1945, from the VA that: “the delays due to the shortage of man-power are not excusable under the terms of the contract, as it has been determined that the man-power situation is not an unforeseeable contingency.”
68. On August 14,1947, plaintiff filed a claim dated August 11, 1947 with defendant that, by its terms, superseded the appeal filed by it with defendant on January 3,1946 [1947], which appeal had dealt with defendant’s refusal to assume liability for wage increases authorized plaintiff by the Wage Adjustment Board. Plaintiff, after reserving to itself the right to submit another claim for all damages sustained thereafter, as soon as they were incurred and ascertained, specified four categories of claims:
(1) The damages sustained by F. H. McGraw & Company and its subcontractors [the word “McGraw” thereinafter to include the subcontractors when appropriate] as a result of the Government’s breach of contract in issuing a stop order which suspended a major portion of the work for a period of more than five months;
(2) The damages sustained by F. H. McGraw & Company as a result of the Government’s breach of contract arising from its undue delay in formulating decisions and authorizing and approving change orders, shop drawings and plans in general;
(3) The damages sustained by F. H. McGraw & Company as a result of the Government’s breach of contract in ordering and then refusing to pay the wage increases approved and directed by the Wage Adjustment Board for the Construction Industry, acting under the Wage Stabilization Agreement to which the Veterans Administration was a party; and
*560 (4) Tbe damages sustained by F. H. McGraw & Company as a result of tbe Government’s breach of contract in interfering with and delaying tbe within project, thereby resulting in (a) material ‘price increases which would not have had to be paid, had there been no stop order, dilatory approval of change orders or other delays; and (b) wage increases which would not have had to be paid, had their been no stop order, dilatory approval of change orders or other delays.
The amounts claimed for the listed categories were:
(1) $260,750.53
(2) 469,522.95
(8) 227,316.49
(4) 25,976.28
On August 18, 1947, defendant acknowledged receipt of the above claim and advised plaintiff, in part:
This claim will be given consideration, and as requested in your submission you will be given a hearing in connection therewith, the exact date to be set later and at your convenience.
On August 21, 1947, defendant advised plaintiff that, in regard to its request for a conference on its claim dated August 11, the date of September 17, 1947, had been set for conference.
69. On September 19, 1947, defendant sent the following-letter to plaintiff:
Reference is made to changes authorized in connection with your contract VAc-1356 at Veterans Administration Hospital, Dearborn, Michigan, as covered by your proposal of January 3,1947, in the additional amount of $706,220.23.
_ An estimate by this office indicates that the total additional value of the changes here involved is in the amount of $376,893.21. This amount was arrived at as shown on the attached sheets. Unless you can show wherein this estimate is in error, a covering change order to your contract will be issued in accordance with this estimate. The matter of additional contract time involved will be determined later.
On September 29, 1947, plaintiff acknowledged receipt of the above letter and its enclosures and advised it would communicate with defendant relative thereto.
*561 70. On September 26, 1947, the following letter was sent to plaintiff by defendant:
Reference is made to my letter of September 19,1947, forwarding estimate by this office in amount $376,893.21, covering Alterations to Units “B” and “C” Building No. 1 under your contract VAc-1356 for Additional Buildings and Utilities for Veterans Administration, Dearborn, Michigan.
As was brought out in telephone conversation you had with this office today, Change Order “TT” dated September 25, 1947, covering the above alterations has been issued increasing the contract price by the sum of $376,893.21. This action has been taken prior to receipt of your reply to letter of September 19,1947, referred to in order that further payment may be made under the contract at this time.
This change order has been sent to the Superintendent of Construction at Dearborn, Michigan, for delivery to your Job Engineer in the customary manner, however, there is enclosed for your information copy of the change order.
Also enclosed is voucher in amount $65,646.61, representing Twenty-Ninth Partial Payment under the subject contract, for your signature in the space provided therefor and return to this office for payment.
On September 29,1947, plaintiff replied to the above letter as follows:
Receipt is hereby acknowledged of your letter dated September 26, 1947, enclosing a copy of a letter dated September 25, 1947, addressed to this company at its Hartford office, which purports to constitute Change Order “TT,” and, in addition, enclosing a public voucher for the sum of $65,646.61, which purports to give effect to the aforementioned Change Order “TT.”
Confirming its prior advice to you upon the subject, the Contractor records its objection to and protest against Change Order “TT,” the assumptions upon which the same is based, the manner in which it has been computed, and the unauthorized nature of the action which it represents.
The amount specified in said Change Order, to wit, $376,893.21 will be received by the Contractor solely and only as a payment on account of the total monies due and *562 owing to the Contractor, and without prejudice to any of its existing or future rights and claims.
71. On October 20, 1947, plaintiff submitted its comments to defendant concerning defendant’s letter of September 19. Included in this letter was the following:
Attached hereto as Exhibit “C” is a copy of the Contractor’s revised proposal for the work, labor and services rendered, and materials supplied in the performance of this major change.
As appears from Exhibit “C,” the work covered by the Contractor’s revised proposal is divided into two categories, the first of which refers to the Subcontractor’s work and the second of which refers to the General Contractor’s work. Under the heading of “Subcontractor’s Work,” we have given effect to the figures which have been agreed upon by all of our subcontractors, with the exception of the Lathing and Plastering Subcontractors, as a result of their direct negotiations with the representatives of the Veterans Administration. These items include a figure of $70,628.00 for electrical work which, we understand, has been negotiated and agreed upon since the issuance of Exhibit “B” [defendant’s breakdown of the items in its September 19th letter]. The amount for that item listed on Exhibit “B” was $48,390.00.
72. On October 27, 1947, defendant sent the following letter to plaintiff:
[Reference is made to your letter of October 20, 1947, regarding interim change order “TT” issued by this office September 25, 1947, in connection with contract VAc-1356 at Veterans Administration Hospital, Dear-born, Michigan.
It is noted that you now submit a revision of your original proposal for the work reducing the amount asked from $706,220.23 to $487,824.73.. The amount so far agreed upon by this office is as follows :
Interim change order “TT”_$376,893.21
Increase in electrical estimate_$22,238. 00
10% commission on increase_ 2,223.80
■- 24,461.80
Total- 401, 355.01
This brings the differential between the latest revised figures set up by you and the present amount so far allowed by this office to $86,469.72.
*563 Most of the items of the difference between your revised estimate and this office’s estimate are subject to factual determination. Before reaching final decision in reference to them, we will have a representative of this office at the site on Monday, November 3, 1947, for further review of these items, some of which have not been previously submitted by you. Please have your representative on these matters at the site for consultation with the representative of this office.
On October 30, 1947, plaintiff replied thereto as follows:
We herewith acknowledge the receipt of your letter dated October 27,1947.
We note that you state in your letter that the Company is now submitting “a revision of your original proposal for the work reducing the amount asked from $706,220.23 to $487,824.73.”
We have not reduced the amount asked to the figure above mentioned. What we have done, according to the suggestions made by you in our last conference in Washington, was to segregate the items of partial damage, included in our original proposal, for later discussion and treatment, leaving, in our original proposal, only the actual cost to us of the labor and materials involved. We have done so only because you indicated that such a segregation would facilitate your consideration of our Notice of Claim dated August 11, 1947. We had no objection to discussing the claims contained in the aforesaid Notice of Claim in whatever manner you preferred, but it was clearly understood at our conference, and it should be clearly understood today, that we did not and do not intend to waive, for any reason or for any purpose, any of the claims set forth in that Notice of Claim.
We note that you will have a representative of your office at the site on Monday, November 3, 1947. We have instructed Mr. James Leahy, our Superintendent, and Mr. Otto Werner, our former Superintendent, to meet your representative at the site at such time.
73. On December 2, 1947, Change Order XX was issued by defendant’s contracting officer, the text being as follows:
With reference to your contract dated February 8, 1945, for Additional Buildings & Utilities for Veterans Administration, Dearborn, Michigan, you are informed *564 that owing to the following mentioned change in the work thereunder:
Making alterations to Units “B” and “C” Building No. 1, in accordance with revised drawings dated November 8, 1946, specifications No. 4466-H-A2, as modified by letter of the Supervising Superintendent of Construction dated November 14, 1946,
the contract price, in accordance with the provisions of the contract, is hereby increased by the sum of Four Hundred Three Thousand Two Hundred Forty Five Dollars Forty One Cents ($403,245.41). The effect of this change upon the contract time will receive subsequent consideration.
The schedule of prices should be supplemented by the notation thereon of the amount, date and designating letter of this change order.
THIS CHANGE ORDER CANCELS AND SUPERSEDES CHANGE ORDER “tt” DATED SEPTEMBER 25, 1947, ISSUED UNDER THIS CONTRACT.
On December 9,1947, plaintiff wrote defendant as follows:
We herewith acknowledge the receipt of Change Order “XX” dated December 2,1947, for the sum of $403,-245.41 which, by its terms, cancels and supersedes Change Order “TT” dated September 25,1947.
It is our intention to file an immediate appeal from your decision, as embodied in that Change Order, to the Administrator for Veterans’ Affairs. In order to file such an appeal, it is necessary that we immediately obtain a breakdown of Change Order “XX,” comparable to the breakdown which accompanied the previously issued Change Order “TT.” Until such breakdown is received, and our appeal duly filed, we desire to record, our objection to and protest against, Change Order “XX,” the assumptions upon which the same is based, the manner in which it has apparently been computed, and the unauthorized nature of the action which it represents. The amount specified in such Change Order, to wit, the sum of $403,245.41, will be received by the Contractor solely and only as a payment on account of the monies due and owing to the Contractor, and without prejudice to any of its existing or future rights and claims.
*565 Since it is perfectly obvious from tbe contents of Change Order “XX,” as well as from all of the proceedings which preceded its issuance, that the Contractor will not receive from the Contracting Officer any fair or equitable disposition of its claims for the damages which have been inflicted upon it by virtue of the Government’s breaches of contract, as more specifically set forth in its Notice of Claim dated August 11, 1947, and since the Contractor desires to prosecute an immediate appeal from the decisions already rendered, and deems it preferable to present all of its claims, based upon the Government’s breaches of contract, at one time, for determination by the Administrator for Veterans’ Affairs, instead of piece-meal, it is requested that you render an immediate decision upon all of the claims set forth and contained in the Contractor’s Notice of Claim dated August 11,1947, to the extent that they have been reserved from, and have not as yet been affected by, the contents of your decisions as embodied in Change Order “XX” and other Change Orders.
As you should know, an appeal cannot be taken to the Administrator until a decision has been rendered by the Contracting Officer. It is for that reason that we are requesting an immediate decision with respect to the claims set forth by us in our Notice of Claim dated August 11, 1947, in order to permit us to present to the Administrator as quickly as possible, all of the claims which the Contractor has heretofore filed, on behalf of itself and all of its subcontractors.
74. On December 16, 1947, defendant’s contracting officer sent the following letter to plaintiff:
In accordance with your request of December 9,1947, there is enclosed a copy of the cost breakdown used, in arriving at and issuing Change Order “XX,” covering changes ordered under your contract VAc-1356 at Veterans Administration Hospital, Dearborn, Michigan.
Deferring to your claim of August 11,1947, mentioned in your letter of December 9,1947, pertaining to damages for breach of contract allegedly sustained by you in connection with your above mentioned contract, the claim is disallowed for lack of jurisdiction. As the contracting officer, I am without authority under existing laws to act upon claims for damages for breach of contract. The foregoing is in accordance with information furnished you in past conferences held at your request in regard to this matter.
*566 75. Tbe following tables compare the “revised Proposal” set forth in plaintiff’s letter of October 20, 1947, Exhibit C thereof (Finding 71) with the cost breakdown used by defendant in issuing Change Order XX.

*567

Attached to the cost breakdown used for Change Order NX were detailed schedules showing the quantity of material and costs and labor costs in support of the tables in Finding 75.
76. On December 19, 1947, plaintiff wrote the following letter to the Administrator of Veterans’ Affairs:
Please take notice that F. H. McGraw & Company, the Contractor under Contract VAc-1356, Dearborn, Michigan, hereby appeals to the Administrator of Veterans’ Affairs, from:
1. The decision of the Contracting Officer dated December 16,1947, disallowing the claims of the Contractor *568 for tbe damages which, it sustained as a result of the breaches of the subject contract by the Veterans Administration, as more particularly set forth in the Contractor’s Notice of Claim, dated August 11,1947;
2. The decision of the Contracting Officer as set forth in his letter dated November 21, 1947, encaptioned Change Order “VV”;
3. The decision of the Contracting Officer as set forth in his letter dated November 21, 1947, encaptioned Change Order “WW”;
4. The decision of the Contracting Officer as set forth in his letter dated November 24,1947;
5. The decision of the Contracting Officer as set forth in his lettér dated December 2,1947, encaptioned Change Order “XX”;
6. The decision of the Contracting Officer as set forth in his letter dated December 2,1947, encaptioned Change Order “YY”;
7. The decision of the Contracting Officer as set forth in his letter dated December 10, 1947, encaptioned Change Order “ZZ”.
The Contractor hereby requests a full and complete hearing upon these appeals, at which it will be granted an opportunity of presenting its testimony in support of its claims and the further opportunity of contesting, by evidence, cross-examination and otherwise, any contentions which may be advanced in opposition thereto. We respectfully request that such a hearing be afforded to the Contractor as rapidly and expeditiously as possible.
The decision of the Contracting Officer dated December 16, 1947, is set out in Finding 74.
Change Order W, dated November 21,1947, for furnishing and erecting three additional access doors in elevator shafts at the 11th floor of Units B and C, increased the contract by the amount of $224, which was $22 less than plaintiff’s proposal as only 10 percent was allowed for overhead on the work done by plaintiff’s subcontractor.
Change Order WW, dated November 21,1947, for extending the radiator convector fronts out to face of wall tile in dishwashing rooms, serving kitchens and nourishment kitchens increased the contract in the amount of $810.70, which was $81.07 less than plaintiff’s proposal as only 10 percent was allowed for overhead on the work done by plaintiff’s subcontractor.
*569 The decision of the contracting officer, dated November 24, 1946, in passing upon a proposal from plaintiff in the amount of $3,758.80 for work done on Building 19, increased the contract in the amount of $3,525.53, allowing plaintiff 10 percent commission on the work performed by the subcontractor instead of 10 percent overhead and 10 percent profit, and had deducted $105.66 for plastering costs.
Change Order XX is set out in Finding 73.
Change Order YY, dated December 2,1947, for installing a four-circuit panel connected to the existing emergency lighting panel in Unit B, increased the contract in the amount of $56.10, which was $5.61 less than plaintiff’s proposal, having allowed only 10 percent commission on subcontractor’s work instead of 10 percent overhead and 10 percent profit.
Change Order ZZ, dated December 10, 1947, making certain changes shown on revised drawings for Building 19, increased the contract in the amount of $3,525.53. This change order formalized the decision of the contracting officer dated November 24,1947, referred to above.
77. Plaintiff’s notice of appeal, dated December 19, 1947, was received by defendant on December 22,1947, and receipt thereof was acknowledged on January 2,1948, by Mr. F. H. Dryden, Assistant Administrator for Construction, Supply & Beal Estate, Veterans’ Administration. Mr. Dryden stated he understood that plaintiff’s attorney had agreed to frame specific issues in the near future, pertaining to each change order mentioned in the notice of appeal, in order that the testimony and evidence before Mr. Dryden would be limited to those questions upon which there was disagreement.
78. By letter dated January 28,1948, defendant’s contracting officer advised plaintiff, as follows:
Beference is made to your letter of January 16, 1948, requesting release of $65,000.00 of the amount of $75,-000.00 retained under contract VAc-1356, Dearborn, Michigan.
The contract date for completion of this work is January 22,1947. The Superintendent of Construction submitted Contract Progress Beport on December 31, 1947, showing total percentage complete of 98%, and estimated date of completion as February 1, 1948. In the event the work is substantially completed on February 1, 1948, there will be an overdue completion of 374 *570 calendar days. If the foregoing delay in completion of the work has been caused by reasons excusable under the terms of the contract, you should submit request for extension of time, together with substantiating evidence.
In the meantime, in view of the present amount of possible accrued liquidated damages, your request for release of retained money cannot be granted until determination has been made as to the element of delay.
By letter dated February 3, 1948, plaintiff advised defendant’s contracting officer that it had requested an extension of time in its letter of August 11, 1947, in which it had reviewed all the facts and circumstances upon which the request was based.
79. By letter dated March 9,1948, plaintiff appealed to the Administrator of Veterans’ Affairs from the decision of the contracting officer, dated February 17, 1948, captioned “Change Order CCC.”
Change Order CCC, dated February 17, 1948, for installing exposed plumbing fixtures of chrome plated finish in lieu of polished brass finish, increased the contract price in the amount of $8,573.67. Plaintiff was allowed a commission of 73/2 percent for work done by the subcontractor.
80. On March 2,1948, defendant’s contracting officer issued Change Order DDD, as follows:
With reference to your contract dated February 8, 1945, for Additional Buildings and Utilities at Veterans Administration, Dearborn, Michigan, you are informed that owing to the following mentioned changes in the work thereunder:
Performing the work contemplated by:
Change Order “H,” dated October 6,1945
Change Order “L” dated October 6,1945
Change Order “J,” dated November 3,1945
Change Order “LL,” dated March 3,1947
Change Order “WW,” dated November 21,1947
Change Order “XX,” dated December 2,1947
Change Order “ZZ,” dated December 10,1947
Change Order “BBB,” dated January 21, 1948
Change Order “CCC,” dated February 17,1948
additional time of two hundred fifteen (215) calendar days is hereby granted in accordance with the terms of the contract. The changes in contract price have heretofore been covered by the change orders referred to.
*571 On. March 2, 1948, defendant’s contracting officer issued Change Order EEE, which granted plaintiff an extension of 60 calendar days for installing painted cement base in lieu of the terrazzo base.
On March 4,1948, the defendant’s contracting officer issued change order “FFF” granting an extension of 20 days, purportedly for the change in wall color paint. The plaintiff had not requested any extension with respect to the wall paint.
81. By letter dated March 9, 1948, plaintiff advised defendant as follows:
We herewith acknowledge the receipt of your letter dated March 2, 1948, which purports to grant an additional period of 215 calendar days for the performance of the work contemplated by Change Orders “H,” “I,” “J,” “LL,” “WW,” “XX,” “ZZ,” “BBB” and “CCC.”
No reference is contained in the letter to the formal request for an extension of time dated August 11, 1947, which was submitted on or about that date by the contractor, or to the contractor’s letter of February 3,1948, calling your attention to the failure of the Contracting Officer to act thereon for a period of more than eight months.
There is, likewise, in the aforesaid letter dated March 2,1948, no mention of the specific period of time granted for each individual change order, the extent of the delays found to be involved in the performance of each such change order, the facts found or refused to be found in connection therewith, and all other circumstances pertaining thereto.
If the contents of your letter dated March 2,1948, are intended to effect a preliminary extension prior to the rendition of a final decision upon our request of August 11,1947, we should be so advised.
If it is intended to represent your final action upon our request of August 11,1947, we should likewise be so advised, so that we may avail ourselves at once of all our rights and remedies in connection therewith.
Your prompt response will be appreciated.
82. By decision dated March 9,1948, defendant’s contracting officer issued Extension of Time No. 2, wherein it was found:
Pursuant to the provisions of the contract, the fact and extent of the delays have been ascertained and it *572 has been found that because of delays due to strikes, the completion of your contract was delayed 78 Calendar Days. Your contract time, therefore, is extended Seventy-Eight (78) Calendar Days.
No appeal was taken from this decision. The plaintiff had not requested any extension of time due to strikes.
83. The only extension of time requested by the plaintiff in its letter of August 11,1947, or any letter, was the extension of time occasioned by the absence of the pile directive and delays caused by the stop order and the major changes effected by the notice to proceed. The plaintiff never sought an extension of time for (1) any alleged strikes; (2) the change in wall paint color; or (3) any of the inconsequential changes involved in change orders “H”, “I”, “J”, “LL”, “WW”, “ZZ”, “BBB” and “CCC”. It never submitted or attempted to submit to the contracting officer any substantiating evidence that any of these items had delayed the overall completion of the work. In his testimony in this case the acting contracting officer (the contracting officer was deceased) did not satisfactorily explain why he granted extensions of time by change orders “DDD”, (215 days), “FFF” (20 days), and Extension of Time No. 2 (78 days) for reasons not requested or proved by plaintiff.
84. By letter dated March 10,1948, to Mr. Dryden, plaintiff set forth the specific issues involved in its notice of appeal, dated December 19,1947:
Change Order XX — The cost of the work actually done and cost of materials actually furnished, including that of the subcontractors; the allowance of only 10 percent for work done by subcontractors instead of 10 percent for overhead and 10 percent for profit; cost of lathing and plastering; cost of work omitted from original proposal; damages accruing because of breach of contract by the stop order of August 23, 1946; delay in making decisions and approving change orders, shop drawing and plans; increased cost due to higher wages and material caused by delays; and, failure to pay wage increases authorized by the Wage Adjustment Board.
Change Orders VV, WW, and YV — The allowance of only 10 percent for overhead on work done by subcontractors *573 instead of 10 percent for overhead and 10 percent for profit.
Change Order ZZ — The allowance of only 10 percent for overhead on work done by subcontractors instead of 10 percent for overhead and 10 percent for profit, and deduction for plastering costs.
Change Order CCC — The allowance of only 7y2 percent for overhead on work done by subcontractors instead of 10 percent for overhead and 10 percent for profit.
85. By letter dated March 15, 1948, defendant’s contracting officer, relative to Change Order DDD advised plaintiff, as follows:
Reference is made to your letter of March 9, 1948, concerning the above change order covering extension of contract time of 215 calendar days for changes in the work, contract VAc-1356, Dearborn, Michigan.
Following the issuance of the foregoing time extension, this office issued on March 2, 1948, Change Order “EEE” dated March 2,1948, covering 60 calendar days’ additional time, Change Order “FFF,” dated March 4, 1948, for 20 calendar days’ additional time and Time Extension No. 2, dated March 9, 1948, for 78 calendar days’ extension of time.
Inasmuch as these time extensions extended your contract date for completion to January 30,1948, or the date of actual completion of your contract work, it is considered that your request of August 11, 1947, has been acted upon.
Plaintiff did not appeal from the decision of the contracting officer concerning Change Order DDD.
86. On March 24, 1948, defendant advised plaintiff that since its appeal from the contracting officer’s decision regarding Change Order CCC was included in its overall appeal dated March 10, 1948, no separate action would be taken on its appeal, dated March 9, 1948, relative to Change Order CCC.
87. On April 6,1948, Mr. F. H. Dryden requested plaintiff to submit data in support of items which were in disagreement.
By letter dated April 19,1948, plaintiff’s attorney advised Mr. Dryden that he and representatives of his company had attended a conference with representatives of the Veterans’ Administration on April 1,1948, in Washington, D. C., con- *574 corning the matters in disagreement and that the results were less than satisfactory.
By letter dated April 30, 1948, Mr. Dryden advised plaintiff that he was appointing a Board to review the facts in the case and to submit recommendations to him upon which a decision, in accordance with Article 15 of the contract, could be made.
On May 10,1948, the chairman of the Board appointed by Mr. Dryden, requested plaintiff’s attorney to advise him if plaintiff desired to submit any further testimony or evidence, either in writing or by personal appearance before the Board. On May 13,1948, plaintiff’s attorney advised that additional evidence would be submitted within a few days, and this information was submitted on May 25. Additional data was submitted on July 9,1948.
88. By letter dated July 30, 1948, plaintiff acknowledged receipt of a voucher in the sum of $50,325, which was designated “Reclaim Voucher”, representing the final settlement due plaintiff in the amount of $52,600, less three credits in the amount of $175, and less the amount of $2,100 which was being retained by defendant pending the painting of acoustical tile. The reclaim voucher was signed under protest and plaintiff advised defendant that it considered the amount provided for therein as partial payment on account of the plaintiff’s claims against the defendant. Exception was taken to the retention of $2,100, and on August 2,1948, plaintiff filed an appeal to the Administrator of Veterans’ Affairs concerning the retention thereof.
The items for $175 had been agreed upon as a deduction in lieu of performing certain work under the final “punch list”.
By letters dated August 13, 1948 and August 17, 1948, plaintiff was advised that its appeal concerning the painting of the acoustical tile had been referred to Mr. Dryden for decision.
89. The decision on plaintiff’s appeals to the head of the department was rendered on October 20, 1948, as follows:
Reference is made to your claims under Contract VAc-1356, for construction of additional buildings and utilities at Veterans Administration Hospital, Dearborn, Michigan, constituting appeals under Article 15 of the *575 contract from decisions which were made by the Contracting Officer.
After careful review of all issues involved in this case, I have reached the following conclusions, viz:
(a) I consider that an equitable adjustment was made by the Contracting Officer upon all items involved in Change Orders, “VV,” “WW,” “XX,” and “ZZ” (summarized in your letter of December 17,1947) except that with regard to Change Order “XX” (which supersedes Change Order “TT”) it was found upon review of the respective items that an allowance was made for hanging 50 doors instead of 112 doors, and that as a result you are entitled to an additional amount of $609.15 under this Change Order.
(b) I consider that an equitable adjustment was made by the Contracting Officer upon all items involved in Change Order “CCC” (covered by your letters of March 9, 1948, and March 10, 1948).
(c) Since the evidence supports the contention made by you in your letter of July 80,1948, in connection with samples which were submitted for acoustical tile, I consider that the Contracting Officer was in error in retaining the sum of $2,100 from the reclaim voucher to which you refer in your letter of August 2, 1948, and I have directed that this amount be refunded to you.
(d) I am in agreement with the position taken by the Contracting Officer in his letter to you of December 16, 1947, in which he disallowed your claim for damages which you allege to have sustained in connection with this contract. As brought out by the Administrator in his letter to you of May 21, 1947, “Neither the Contracting Officer nor the Administrator of Veterans Affairs, on proper appeal, has the power to determine a contractor’s claim for breach of contract.” For the reasons brought out in these letters, and since appropriations of the Veterans Administration are not available for payment of a claim of this nature, the claim is denied.
(e) I have found, with regard to your claim for increased labor costs, that you in fact paid rates of wages in excess of the rates listed in the specifications in order to procure laborers and mechanics for completion of this work. This was due to abnormal labor eondi-tions_ existing at the time and over which the Veterans Administration had no control. The rates of wages in the specifications are listed as “minimum” wages and there was no guarantee, either expressed or implied, that you could procure qualified laborers and mechanics at these rates. Since there was no contractual obliga *576 tion requiring the Government to pay any additional sum for the extra expenses you incurred by reason of payment of wages in excess of those listed in the specifications, and since the appropriations of the Veterans Administration are not available for payment of a claim of this nature, the claim is denied.
I am directing the Contracting Officer to prepare and forward to you for signature, a voucher in amount $2,-709.15, in order that payment may be made to you in accordance herewith.
As stated above, the record affords no basis for challenging the finality of the decisions of the contracting officer or the head of the department on appeal. It will be noted that neither the contracting officer nor the head of the department assumed jurisdiction to allow damages resulting from the unreasonable delay caused by the issuance of the stop order.
The contracting officer, and in his absence due to illness, the acting contracting officer, was assigned between 50 and 250 construction jobs during the period of performance of the contract in this case. The VA’s head representative on the job, the superintendent of construction, was not authorized to issue an interpretation of the contract, or specifications, or the stop order upon which the plaintiff could rely, nor was he permitted to exercise any independent judgment or discretion in connection with the operation of the job. The Washington office of the VA exercised rigorous control over every phase of the project, regardless of how minute. The record establishes that the plaintiff was caused unnecessary and unreasonable delay and expense by the Veterans’ Administration’s procrastination and the above outlined procedure.
DAMAGES
90. Plaintiff has been paid the contract price as adjusted by change orders, amounting to the sum of $3,575,123.40. Its direct costs, verified by the defendant, on the job was the sum of $3,987,712.50.
Plaintiff has established the propriety and reasonableness of its bid, and consequently, of the contract price, both by expert testimony and by an analysis and comparison of its bid with all the bids on the project.
*577 The difference between plaintiff’s costs and the sum received, or $412,589.10, represents plaintiff’s direct loss on the job. This loss is attributable, in the main, to two factors, namely, increased wages paid as a result of the lifting of wage controls upon the termination of the war, and the disruption, loss of continuity, and delay caused by the issuance of the stop order.
Throughout the job plaintiff complained about the difficulty of obtaining an adequate supply of various types of labor, and no doubt some part of its loss was attributable to this condition.
91. Plaintiff says that the increased wages paid by it up to and including March 22,1947, amounted to $66,659.37. The books of plaintiff were audited by the Federal Bureau of Investigation and this sum was not challenged by the defendant. The significance of the March 22, 1947 date, is the time to which the contract performance period was extended by the 60-day extension in connection with securing steel piles, and the 240-day extension for the change of nurses’ quarters (“JJ”) initiated early in the job, neither of which extensions plaintiff questions.
92. The testimony and an analysis of the plaintiff’s payrolls and the contract progress report reasonably establish that the unreasonable interference and delay caused by the stop order prevented the performance of 37% of the unchanged work under the original specifications that could have been performed during 129 days of the 159-day stop order period, and caused the work on the project to be delayed 48 days.
The plaintiff’s average overhead for 48 days during the stop order period is as follows:
Field office overhead- $4,968.00
Field overhead (equip, etc.)_ 5,093.28
Partial Home Office overhead_ 5,247.84
Total-$15,309.12
93.The plaintiff claims $28,531.15 as damages because the VA’s procrastination and unnecessary disruption and delay prevented the plaintiff from effectively and efficiently planning and coordinating its work on the project. This is *578 an estimated amount based on an experienced judgment and although more detail could have been furnished, the record as a whole does show that the plaintiff was damaged to this extent.
94. The contract was accepted as substantially complete on January 30, 1948; however, because of the delays of the YA and its inability to make up its mind on some of the equipment to be installed in Building No. 19, the delivery and installation of that equipment was delayed beyond January 30, 1948, to May 24, 1948. The plaintiff was required to supervise the installation of this equipment and incurred field office expense in the amount of $13,281.62 that it would not have otherwise incurred.
Although the plaintiff has suffered other damages from the VA’s action and inaction, it has failed to satisfactorily prove them.
SUBCONTRACTORS
95. There are involved in this suit claims of eight subcontractors. In general their losses were the result of the same factors which contributed to plaintiff’s losses. The claims of these subcontractors will be taken up individually.
DRAKE AVERY COMPANY
96. The Drake Avery Company claims the sum of $47,140.04.
By subcontract dated May 1,1945, and executed on June 14, 1945, Drake Avery Company agreed to furnish all labor and material and perform all work required under plaintiff’s prime contract for plumbing and heating in the lump sum of $392,000.
The contract provided in part:
If the Subcontractor shall be obstructed or delayed in the prosecution or completion of the work * * * by the act, neglect, or default of the Contractor, or the Owner, or of any other Subcontractor employed by or dealing with the Contractor, * * * or by the stopping of the work by employees oí the Owner, the Contractor, or any other Subcontractor, through no default of the Subcontractor, then the time fixed for the completion of the work shall be extended for a period equivalent to the time lost by any or all of the causes aforesaid, but no such *579 allowance shall be made unless a claim therefor is presented in writing to the Contractor within seven (7) days of the occurrence of such delay. The subcontractor shall not have, and hereby waives, any claim whatever for any damages resulting from delays, regardless of the cause. The only right which he shall possess, under such circumstances, is the right to apply for an extension of time under the provisions of this article.
‡ *
The acceptance by the Subcontractor of the final payment under this Agreement shall be and shall operate as a complete and unconditional release to the Contractor of any and all existing or future claims or demands by the Subcontractor against the Contractor, known or unknown, whatever they may be or howsoever they may arise, as well as for every act and neglect of the Contractor and any person or firm for whom the Contractor shall or may be deemed responsible.
Plaintiff has paid and Drake Avery Company has accepted final payment under this subcontract.
The claim of Drake Avery Company is not wholly related to changes ordered under the partial stop order of August 23, 1946. The claim consists of five items, as follows:
Schedule 1 is for the claimed increases in labor rates paid during the period of Drake Avery Company’s presence on the project site in the amount of $19,058.96, which amount was reduced to $16,326.50, by eliminating therefrom claims for work done under the changes covered by Change Order XX. The record does not reflect how much of this claimed increase in labor rates has been paid to Drake Avery Company by virtue of adjustments to its contract for changes performed in connection with Change Order JJ, at the going rate of wages at time of the change order. The proof of damages is unsatisfactory.
Schedule 2 is for the claimed loss of efficiency by mechanics and for increased job supervision during the period of the partial stop order in the amount of $17,614.47, and Schedule 5 is for the claimed loss of general overhead due to loss of continuity during the period of the partial stop order in the amount of $4,374.38.
Schedule 4 is for claims for Drake Avery Company’s subcontractors in the amount of $8,325.79. There is no proof to support such claims.
*580 Schedule 3 is for the claimed costs of offsite storage in the amount of $498.90.
DETROIT MARBLE COMPANY
97. Detroit Marble Company claims the sum of $4,510.57.
By subcontract dated August 11, 1945, and executed on August 27, 1945, the Detroit Marble Company agreed to furnish all the labor and materials and to perform all work required under plaintiff’s prime contract for marble installation in the lump sum of $26,000.
The subcontract had the same provisions as those relating to damages for delays and final payment as those in the Drake Avery Company’s subcontract, as set out in Finding 96, supra.
Plaintiff has paid and Detroit Marble Company has accepted the final payment under the subcontract.
The claim is for an additional sum of money which the owner of the company testified that he had paid to his supplier for the marble shipped and for added labor and dray-age costs. But the evidence clearly shows that this testimony was incorrect and the company had not paid any extra sums for the marble.
O. LARSEN COMPANY
98. C. Larsen Company claims the sum of $88,247.64.
By subcontract executed June 4, 1945, C. Larsen Company agreed to furnish all labor and material to erect the forms for the concrete and fireproofing required under plaintiff’s prime contract for the lump sum of $170,625.
The subcontract had the same provisions relating to damages for delays and final payment as those in Drake Avery Company’s subcontract, as set out in Finding 96, supra.
Plaintiff has paid and C. Larsen Company has accepted the final payment under the subcontract.
C. Larsen Company’s claim is for wage increases paid and for additional labor costs. It is not related to the partial stop order of August 23, 1946.
C. Larsen Company had planned to finish the subcontract within six months, with an estimated labor cost of $96,802.21, and by using 450,000 board feet of lumber. It actually took from April 17, 1945, to November 27, 1946, to complete the *581 subcontract without interference from the partial stop order of August 23, 1946, at a total labor cost of $189,537.28, and required over 500,000 board feet of lumber.
TURNER BROOKS, INC.
99. Turner Brooks, Inc. claims the sum of $1,215.26.
By subcontract dated May 24, 1945, executed on June 4, 1945, Turner Brooks, Inc. agreed to furnish all labor and material and perform all work required to install the asphalt tile and linoleum floors required by plaintiff’s prime contract in the lump sum of $35,500.
The subcontract had the same provisions relating to damages for delay and final payment as those in the Drake Avery Company’s subcontract, as set out in Finding 96, supra,.
Plaintiff has paid and Turner Books, Inc. has accepted the final payment under the subcontract.
The claim of Turner Brooks, Inc. is for the difference between wage differential paid and the wage rate used in estimating the subcontract.
Turner Brooks, Inc. did not contemplate the performance of its subcontract until one to one and a half years after the execution of the subcontract.
Even though there had been periodic wage increases from 1940, it made no allowance in its subcontract price for wage increases or overtime payments, even though it- did not know how long it would take to complete the subcontract.
C. O. STRUSE & SONS
100. C. O. Struse & Sons claims the sum of $23,551.93.
By subcontract dated April 30,1945, C. O. Struse & Sons agreed to furnish all labor and materials and perform all work required to install all brickwork, hollow building tile, gypsum partition, tile, glazed structural facing units and furring required under plaintiff’s prime contract for the lump sum of $320,000.
The subcontract provided, in part, as follows:
If the Subcontractor shall be obstructed or delayed in the prosecution or completion of the work * * * by the act, neglect or default of the Contractor, or the *582 Owner, or of any other Subcontractor employed by or dealing with the Contractor, * * * or by the stopping of the work by employees of the Owner, the Contractor, or any other Subcontractor through no default of the Subcontractor, then the time fixed for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all the causes aforesaid. *****
The acceptance by the Subcontractor of the final payment under this Agreement shall be and shall operate as a complete and unconditional release to the Contractor of any and all existing or future claims or demands by the Subcontractor against the Contractor, known or unknown, whatever they may be or howsoever they may arise, as well as for every act and neglect of the Contractor and any person or firm for whom the Contractor shall or may be deemed responsible.
Plaintiff has paid and C. O. Struse & Sons has accepted the final payment under the subcontract.
C. O. Struse & Sons’ claim is for premium wages and wage increases paid by it, less certain credits.
By agreement dated April 8,1946, plaintiff agreed to pay C. O. Struse & Sons one-half of the premium time paid by it. Plaintiff paid Struse the sum of $5,512.80 for premium time under its agreement. In the event that Struse collects on its claim for premium time, it has promised to repay plaintiff the amount of premium overtime paid to it by plaintiff.
In negotiating the costs attendant upon the changes, reflected in Change Order XX, C. O. Struse & Sons executed a release for all further claims in connection therewith.
C. O. Struse & Sons has made allowance in the claim for the increase in wages paid in connection with Change Order JJ, but not for the wages paid in connection with Change Order XX.
PONTIAC MILLWORK COMPANY
101. Pontiac Millwork Company claims the sum of $1,306.50.
By purchase order dated May 26, 1945, plaintiff ordered from Pontiac Millwork Company all the millwork, except *583 ceiling moulding, required by plaintiff’s prime contract for the lump sum amount of $24,666.
Plaintiff has paid Pontiac the sums agreed upon for the millwork and Pontiac did not make demand for any additional sums.
Pontiac Millwork Company’s claim is for the additional sum of money which it voluntarily paid its supplier for the millwork because of the increase in prices between the date of the order and the date óf delivery. The millwork was not delivered until October 1946, because the project was not ready for it until then, although the original scheduled date was November 1945.
The claim of Pontiac Millwork Company was not presented to the Veterans’ Administration in plaintiff’s appeal of August 11, 1947. The increased costs claimed were not due to any fault or negligence of the Government.
THE DOUTHETT-ARCHIBALD COMPANX
102. The Douthett-Archibald Company claims the sum of $30,312.08.
By subcontract dated December 4, 1945 and executed on December 19,1945, the Douthett-Archibald Company agreed to furnish all labor and materials and perform all painting work required under plaintiff’s contract for the lump sum of $60,000.
The subcontract had the same provisions relating to damages for delay and final payment as those in the Drake Avery Company’s subcontract, as set out in Finding 96, supra.
Plaintiff has paid and Douthett-Archibald has accepted the final payment under the subcontract.
Douthett-Archibald’s claim is for all wage increases over those used in its estimate, for overhead expenses, and for increased material costs from April 30, 1946 to February 4,1948, plus an estimated amount for the “loss of continuity” due to the partial stop order.
Douthett-Archibald had two men present on the project site from February 2, 1946 through April 8, 1946 painting *584 window frames and door bucks. Upon the completion of this work, Douthett-Archibald withdrew its painters, and plaintiff backcharged Douthett-Archibald for the services of a painter which it maintained on the job until Douthett-Archibald returned to the project on August 22,1946.
During the period of the partial stop order, Douthett-Archibald did routine painting and did not start the painting of wall surfaces until January 22,1947.
HATZEL & BUEHLER, INC.
103. Hatzel & Buehler, Inc. claims the sum of $24,640.41.
By subcontract dated April 30,1945, executed on June 19, 1945, Hatzel & Buehler, Inc. agreed to furnish all labor and materials and perform all electrical work required in plaintiff’s prime contract for the lump sum of $185,000.
The subcontract had the same provisions relating to damages for delay and final payment as those in the Drake Avery Company’s subcontract, as set out in Finding 96, supra.
Plaintiff has paid and Hatzel & Buehler, Inc. has accepted the final payment under the subcontract.
Hatzel & Buehler’s claim is for wage increases paid from the inception of the job through February 4, 1947; for overhead from the estimated completion date of May 15, 1946 through March 30, 1948; storage and the cost of the erection of a storage shed; and for an estimated loss due to the partial stop order.
Hatzel & Buehler has made no allowance for the work done under Change Order JJ during the period ending February 4,1947, which changes were paid on the basis of then current wage rates.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is adjudged and ordered that plaintiff recover of and from the United States the sum of fifty-seven thousand one hundred twenty-one dollars and eighty-nine cents ($57,121.89).